**Peter Joseph CALDARERA, Jr., et al.**

v.

**EASTERN AIRLINES, INC., et al.**

**No. 810980.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Jan. 19, 1982.

---

the scope of the Equal Credit Opportunity Act and the choice of the applicable law.

Edward M. Carmouche and David R. Frohn, Camp, Carmouche, Palmer, Barsh & Hunter, Lake Charles, La., Donald A. Hoffman, New Orleans, La., for plaintiffs.

Hills, Betts & Nash, New York City, Ernest A. Carrere, Jr. and John V. Baus, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants The Boeing Co.

Haight, Gardner, Poor & Havens, New York City, Francis G. Weller, Deutsch, Kerrigan & Stiles, New Orleans, La., for Eastern Airlines.

Richmond Fisher, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., Joseph S. Cage, Jr., U.S. Atty., W.D. La., Shreveport, La., for the U.S.

## MEMORANDUM RULING

VERON, District Judge.

## I. INTRODUCTION

Plaintiff, Peter Joseph Caldarera, Jr., a resident of Lake Charles, Louisiana, instituted this action in the United States District Court for the Eastern District of Louisiana on December 24, 1975 against Eastern Airlines. Jurisdiction was based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and plaintiff requested trial by jury. Plaintiff sought to recover for damages sustained on his own behalf and as legal representative of his son, Christopher Moore Caldarera, as a result of the wrongful death of his wife, Mary Helen Caldarera, his mother, Rose T. Caldarera, and his son, Michael Joseph Caldarera. All three of the decedents were passengers aboard Eastern Airlines Flight 66 en route from New Orleans to New York City on June 24, 1975, and all

three perished when the aircraft crashed on approach to John F. Kennedy International Airport in New York.

Thereafter, the Judicial Panel on Multidistrict Litigation ordered all actions related to this air disaster transferred to the Eastern District of New York (situs of the crash) for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The United States, as the employer of the allegedly negligent New York air traffic controllers, was made a party defendant by supplemental complaint while the case was before the Eastern District of New York. Jurisdiction of the claim against the United States was based on 28 U.S.C. § 1346(b) because it was brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.

These consolidated actions were then set for trial on the question of the liability of both Eastern Airlines and the United States. Before trial, the United States conceded liability and on October 31, 1978, a jury found Eastern liable. The jury's verdict was affirmed by the Second Circuit Court of Appeals. *In Re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67 (2nd Cir. 1980).

Following these findings of liability, plaintiff's case was transferred to the United States District Court for the Eastern District of Louisiana for trial on the issue of damages. Thereafter, the case was transferred to this court pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and a jury trial was held on November 16 and 17, 1981. The jury having determined the amount of compensation owed plaintiff by Eastern Airlines, it is now this court's duty to determine the amount of compensation owed by the United States. The task is not an easy one.[1]

Plaintiff, Peter Joseph Caldarera, Jr., contends that he is entitled to be compensated for the following elements of damage:

(1) loss of the companionship, comfort, love, and affection of his wife, son, and mother, including his grief, shock, and mental and physical anguish resulting from these deaths; (2) loss of his wife's support, services, and financial contribution; (3) pain, suffering and mental anguish of his wife, mother and son; (4) loss of the support of his mother; (5) loss of the property of his mother, wife and son; and (6) funeral and burial expenses occasioned by the deaths. In addition, plaintiff contends that his sole surviving son, Christopher Moore Caldarera, is entitled to be compensated for the loss of love and affection, comfort, companionship, grief, shock, and mental and physical anguish suffered by him as a result of his mother's death, as well as for the loss of her support, nurture, guidance and financial contribution.

## II. LOSS OF COMPANIONSHIP, LOVE, AFFECTION, AND PHYSICAL AND MENTAL ANGUISH

In determining the amount of compensation owed for the loss of love and affection suffered by the plaintiff, the court is entitled to consider "those interactions between members of the family which tend to reflect the closeness of the family unit, the congeniality between its members, their common interests, and generally, the type of treatment and conduct which not only engenders love and affection but nurtures it to its fullest extent." *Dyson v. Gulf Modular Corp.*, 345 So.2d 1222, 1225 (La. App. 1st Cir. 1977).

The uncontroverted evidence presented to the court in this case establishes that the Caldareras were an extremely close knit, extended family. Peter Caldarera was an only child and the "senior" Caldareras were devoted parents. When he was only eight years old, they began bringing Pete to work with them at the family store. Father Benefiel, the Caldarera family priest, testified that he never saw one of the three without the other two. As a young child, Pete

---

1. We are unaware of any reported Louisiana decision dealing with a tragedy of this magni-    tude.

began working at the shop performing simple chores set aside for him by his parents. As he grew older, his chores became more complex and his responsibilities increased. When Pete got his driver's license, he began to take over deliveries for the shop. When it became apparent that Pete was interested in eventually taking over the business, his parents spent countless hours training him in its day to day operations. They also sent him to various workshops to learn about the different facets of the business.

As the little shop began to grow, Pete became a full partner, working side by side with his mother and father. After Pete's marriage to Helen, the "junior" Caldareras settled in Lake Charles and Helen entered the Caldarera fold. This extended family relationship was made even closer by the fact that the "senior" Caldareras lived next door to Pete and his family.

Rose Caldarera's long time devotion to her son extended up to the day of her death. Following the death of Pete's father, Rose was the one who cared for the shop on weekends to allow Pete extra time with his family. She also took an active and supportive role in raising the "junior" Caldarera children. On the day of her death, for example, she was accompanying Helen on the trip to New York to give her grandson, Michael, the same tour Pete's father had given Pete as a child. There is no doubt in the court's mind that Pete held a great deal of love and affection for his devoted mother and that her death was a very real and substantial loss.

Neither is there any doubt that Pete held a great deal of love and affection for Helen, his wife of twelve years, and Michael, his eight year old son. Helen's background was similar to Pete's. She too came from a small, closely-knit family. Father Benefiel, who knew both families well, testified that Pete's and Helen's marriage mirrored that of their parents. The evidence is clear that Helen shared Pete's dreams of owning a family business and that she adopted his

goals as her own. After their marriage, she became a true member of the Caldarera family and worked side by side with Pete building the family business. Although Helen's working time was reduced with the birth of her children, she often pitched in to alleviate the increasing workload born by Pete after his father's death. She was described by all who testified as a very supportive and generous woman.

Although the love Pete held for his son was of a different nature than the love he held for his wife, the court is satisfied that the bond was strong. Michael was the first born of Pete's and Helen's marriage. He was described in various ways by friends and neighbors as a precocious youngster, an excellent student, and one who was friendly and polite to all in his company. There is no doubt in the court's mind that he was the kind of child any parent would be proud to call his own.

This court cannot conceive of any damages suffered by Pete which could be more real than the deprivation of the love, comfort, assistance and companionship that flowed from these members of his family.

This sentiment applies equally to the loss suffered by Pete's sole surviving son, Christopher, as a result of the death of his mother.[2] Christopher was four years old at the time of the tragedy. He had, by that time, grown accustomed to receiving a great deal of attention from his mother. His older brother had been in school for several years. Neighbors and friends testified that Helen took him everywhere she went. They went shopping and baked cookies together. Christopher was deprived of the support, nurture and guidance of an extremely devoted mother during most of his formative years. Helen provided him with the loving care, moral advice, education and training so crucial to the development of a healthy child. She was an omnipresent force in his life during those early years. Although counsel for the plaintiff spared Christopher the ordeal of recounting how he felt at

---

**2.** The court has not overlooked the fact that Christopher also suffered because of the deaths of his brother and grandmother. However, LCC–Article 2315 gives him no cause of action for these losses.

losing his mother, the court nonetheless attaches great credibility to the testimony of the witnesses and finds that Christopher suffered a very real and substantial loss as a result of his mother's death.

The court is also aware of the grief and mental anguish that is inevitably suffered when a loved one meets an untimely death. In this case the anguish is compounded by the fact that three out of five family members perished in the same accident. In addition, the survivors spent two agonizing days before their worst fears were confirmed, as the bodies were identified one at a time. Father Benefiel testified that he had never witnessed such sorrow in all of his twenty-one years as a priest.

Christopher returned from staying with his maternal grandparents to find his home full of strangers and confusion. Once the deaths were confirmed, Pete was faced with the monumental task of explaining to his only surviving son that his mother, grandmother, and brother would never return. He then had to arrange for a triple funeral. Neighbors testified that after the tragedy, Pete lost considerable weight. He became withdrawn, nervous and irritable. Mr. Downing, a clinical psychologist, testified that Pete suffered through long bouts of deep depression for a considerable period of time. This court has no doubt that both Pete and Christopher suffered tremendous grief and mental anguish at losing three members of their closely-knit family unit. Mr. Downing's testimony establishes that this grief and anguish endured long after that fateful day in 1975, and that holidays, anniversaries and birthdays are still sensitive periods in their lives.

■■ Having considered the closeness of the Caldarera family unit, we find that for the loss of companionship, love, affection, and physical and mental anguish suffered as a result of the wrongful death of his wife, mother and son, Peter Caldarera is

entitled to be compensated by the sum of $400,000.00 for the loss of his wife, $100,000.00 for the loss of his mother, and $150,000.00 for the loss of his son. For the loss of companionship, love, affection and physical and mental anguish including the loss of support, nurture and guidance suffered as a result of the wrongful death of his mother, Christopher Caldarera is entitled to be compensated by the sum of $400,000.00.

## III. LOSS OF SERVICES, SUPPORT, AND FINANCIAL CONTRIBUTION

■ The court is cognizant of the fact that under Louisiana law the loss of a wife-mother's services is compensable. The surviving spouse is entitled to recover the value of the decedent spouse's services in the home which include such things as cooking, cleaning, housekeeping and the like. *Marceleno v. State Dept. of Highways*, 367 So.2d 882 (La.App.2d Cir. 1978). We are also aware that in computing the value of such services, the court may consider the testimony of any expert witnesses presented by the plaintiff.

In this case, plaintiff's expert, Dr. Chisholm, estimated the value of the household services rendered by Helen Caldarera from the date of death to the date of trial to be $34,021.00. This estimate was based on the cost of paying outside help for maid service at the prevailing minimum wage rate. Dr. Chisholm also estimated the value of the household services Helen would have rendered subsequent to the trial for the remainder of the plaintiff's life expectancy (37.8 years) to be either $733,525.52 or $1,328,557.89 depending upon whether one projected a seven percent or a ten percent annual increase in the minimum wage scale.[3]

Further, Dr. Chisholm estimated the present value of the amount necessary to meet these projected costs to be between $171,398.49 and $379,311.32 depending upon

---

**3.** These figures assume a constant rate of increase in the minimum wage scale and make no allowance for fluctuations caused by other factors such as recessions. Neither do they account for the fact that a certain percentage

of a housewife's services are for her own personal benefit and consumption. In this case Dr. Chisholm allowed that 20% would be a fair estimate of those services which personally benefitted Helen.

whether one applied a six percent or eight percent discount rate.[4]

We accept Dr. Chisholm's estimate of Peter Caldarera's life expectancy (37.8 years) as the appropriate number of years to be used in arriving at an award for the loss of Helen's services. However, whether the minimum wage rate would increase annually over this period of time by seven percent or ten percent is too speculative a factor to be considered by this court. Although the defendants presented no expert testimony to rebut Dr. Chisholm's, the court is aware that recessions could cause the minimum wage rate to remain constant over a period of years or at least cause it to increase at less than a seven or ten percent annual rate. We are also aware of the speculation involved in arriving at an appropriate discount rate in this type of case. See "The Appropriate Discount Rate in Personal Injury Cases," 29 La.Bar J. 184 (1981). After considering the foregoing expert testimony, we make the following findings.

At the time of her death, Helen Caldarera was 33 years of age. The uncontradicted evidence is that she was a loving, generous and supportive wife as well as an affectionate and devoted mother. Evidence of an extremely close husband-wife and mother-child relationship is abundant. Both Pete and Christopher were deprived of a wife-mother who, according to Father Benefiel, "kept their home immaculate."

■ Accordingly, the court finds that for the loss of his wife's services, Peter Caldarera is entitled to compensation in the amount of $134,021.00.

■ Although plaintiff contends that he is entitled to be compensated for the loss of his wife's support and financial contribution, no evidence was adduced at trial to support his contention. Therefore, the court finds that plaintiff is not entitled to be compensated for the loss of his wife's financial support and contribution.

## IV. PAIN AND SUFFERING OF THE DECEDENTS AND LOSS OF THE SUPPORT OF ROSE CALDARERA

■ Under Louisiana law, survivors are given the right to recover the damages, including pain and suffering, which the victims suffered and would have been entitled to recover from the defendants, if the victims had lived. This is commonly referred to as the "survival action" inasmuch as it survives the death of the decedents and passes to certain named beneficiaries as an inheritable property right. LCC–Article 2315; *Guidry v. Theriot*, 377 So.2d 319 (La. 1979). However, an award for such damages is predicated upon a showing that they existed. In this case, the plaintiff presented no evidence that the victims suffered any conscious damages. Therefore, the court finds that the plaintiffs are not entitled to be compensated for the pain, suffering and mental anguish of the decedents.

■ As regards plaintiff's claim for the loss of support of his mother, no evidence was adduced at trial that such a loss occurred. Accordingly, the court finds that Peter Caldarera is not entitled to be compensated for the loss of the support of his mother.

## V. LOSS OF PROPERTY AND FUNERAL AND BURIAL EXPENSES

Although plaintiff's complaint contends that he is entitled to be compensated for the loss of the property of his wife, mother and son, the parties entered a stipulation prior to trial that property damage will be limited to five hundred dollars ($500.00) and that this sum would be added to whatever verdict is reached by the court. The parties also entered into a stipulation that the funeral expenses amounted to $12,959.00 and that this sum was to be added to whatever award was rendered by the court.

---

4. Taking the $733,525.52 figure, an award of $234,125.59 would be necessary if the six percent discount rate were applied and an award of $171,398.49 would be necessary if the eight percent discount rate were applied. Taking the $1,328,557.89 figure, an award of $379,311.32 would be necessary if the six percent discount rate were applied and an award of $267,056.49 would be necessary if the eight percent discount rate were applied.

Accordingly, the court hereby orders that the compensation awarded Peter Caldarera be increased by $13,459.00 so as to bring his total damages to $797,480.00.

## VI. DEFENDANT'S MOTION TO AMEND JURY'S VERDICT OR ALTERNATIVELY TO EXAMINE JURORS TO ASCERTAIN TRUE VERDICT

On November 17, 1981, the jury rendered a verdict against Eastern Airlines in this case awarding the plaintiff, Peter Joseph Caldarera, $937,500.00 for the wrongful death of his mother, wife, and son. In the same verdict, the jury awarded plaintiff's minor son, Christopher Caldarera, an identical amount ($937,500.00).

Thereafter, defendant, Eastern Airlines, Inc. filed this motion to amend the jury's verdict, contending that the amounts awarded were excessive and that the jury erred in awarding the exact same dollar amount as damages to Christopher Caldarera for the loss of his mother, as was awarded to Peter Caldarera for the loss of his mother, wife, and son.

■ Our decision in this matter is controlled by the "maximum recovery rule" announced by Judge Rubin in *Glazer v. Glazer*, 278 F.Supp. 476 (E.D.La.1968) and adopted by the Fifth Circuit in *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970). This rule requires that before deciding whether or not the jury's verdict was excessive, the court must fix the amount it thinks a properly functioning jury would have awarded. Thus, the starting point is that amount of damages the court thinks is supported by the evidence. The court must then determine the "maximum amount of deviation from that verdict that could be allowed without requiring a new trial." *Glazer, supra*, at 482.

In this case the court determined, independent of the jury, that the evidence supported an award to Peter Joseph Caldarera in the amount of $797,480.00 for the wrongful death of his wife, mother, and son. It must be noted that the greatest part of this award was attributed to the loss of love and affection and mental anguish suffered by the plaintiff. These elements of damage are very subjective and intangible, and reasonable minds, presented with the same evidence, could differ as regards the degree of devotion Pete felt towards his family. This difference would of course be reflected by the total dollar amount of the damages awarded. However, we are not concerned over the fact that there is a difference between what the court would award and what the jury actually awarded. Our only concern is with whether or not the jury verdict exceeds the maximum amount that can be allowed without requiring a new trial.

■ In light of the subjective nature of the damages in this case, we find that the jury verdict of $937,500.00 does not exceed the maximum amount of deviation that can be allowed without requiring a new trial. Accordingly, the court holds that the award of $937,500.00 to Peter Joseph Caldarera, Jr. should not be disturbed.

■ On the other hand, the evidence does not support a like award to Christopher Moore Caldarera. Our independent assessment of the compensation due Christopher for the wrongful death of his mother was $400,000.00. Mindful of the discretion which must be afforded the jury in fixing damages where the losses are so subjective and intangible, we nevertheless find that $937,500.00 exceeds the maximum amount of deviation that can be allowed without requiring a new trial. The court finds that the maximum amount of deviation that can be allowed under these facts is $200,000.00. Therefore, we hold that the jury's award to Christopher of $937,500.00 should be reduced to $600,000.00.

■ Defendant has also moved the court to have the jury examined in order to ascertain their true verdict. In support of its motion, defendant cites *Freid v. McGrath*, 135 F.2d 833 (D.C.Cir.1943) as authority for the proposition that it may be proper to receive affidavits of the jurors to ascertain their true verdict when it is not clear what the jury intended. While we do

not argue that this procedure may be proper where a question exists as to what the jury intended, such a procedure is not warranted under the facts of this case. The interrogatories propounded to the jury contained two simple questions. One was directed to the amount of compensation owed Peter Joseph Caldarera for the loss of his mother, wife, and son, and the other was directed to the amount owed Christopher Caldarera for the loss of his mother. In addition, the verdict was read in open court and the jurors were individually polled as to whether they agreed with the verdict. Each answered affirmatively. While we may not agree with the amount of the jury's award, the court is nevertheless satisfied that there was no mistake as to the jury's intention.

Inasmuch as one of the precepts of our legal system is that jury deliberations should remain secret, defendants motion to have the jury examined is hereby DENIED. See Pessin v. Keeneland Association, 298 F.Supp. 593 (E.D.Kan.1969) and cases cited therein.

## VII. CONCLUSION

This case was submitted to separate fact finders because of the different requirements of the Federal Tort Claims Act and the Constitution of the United States. While the plaintiff's have a constitutional right to have their claim against Eastern Airlines determined by a jury, claims against the United States must be heard by a judge sitting without a jury. 28 U.S.C. § 2402.

Different fact finders can and do come to different conclusions from the same evidence and that possibility is inherent in every claim under the Federal Tort Claims Act involving the government and a non-government tortfeasor. Different conclusions were reached in this case. The court fixed the total amount of compensation owed plaintiff by the United States to be $1,197,480.00. Granting defendants motion to amend the jury's verdict, the court also fixed the total amount of compensation owed plaintiff by Eastern Airlines, Inc. to be $1,537,500.00. Since the amounts awarded by the jury in favor of the plaintiffs and against Eastern Airlines exceeds the amount awarded by the court against the United States for the same elements of damage, the court is called upon to determine the extent of each defendants liability.

Under Louisiana law, the United States and Eastern Airlines are co-obligors and liable to plaintiffs in solido. La.C.C. Art. 2324. However, the solidary nature of that liability extends only to the full amount of the verdict against the United States. Eastern Airlines is solely liable for the amount in excess of the court's verdict. Thus, we hold that the United States and Eastern Airlines are liable in solido to the plaintiffs in the amount of $1,197,480.00 and Eastern Airlines is solely liable for the difference between $1,197,480.00 and the remitted jury verdict of $1,537,500.00.

Under Louisiana law, Eastern Airlines is also liable for the legal interest on this judgment which accrues from the date of judicial demand. L.S.A.–R.S. 13:4203. However, pre-judgment interest is not permitted against the United States. 28 U.S.C. § 2674. Therefore, the United States will only be liable for legal interest from the date of this judgment until the amounts awarded are paid.

Counsel for plaintiffs shall prepare a form of judgment consistent with this opinion and present it to counsel for defendants for approval as to form, after which it shall be presented to the court for signature. The judgment shall include all amounts awarded against the United States and Eastern Airlines, Inc.