Peter Joseph CALDARERA, Jr., etc., et al., Plaintiffs-Appellees,

v.

EASTERN AIRLINES, INC., and United States of America, Defendants-Appellants.

No. 82–3186.

United States Court of Appeals, Fifth Circuit.

May 27, 1983.

Deutsch, Kerrigan & Stiles, Francis G. Weller, Marc J. Yellin, New Orleans, La., for defendants-appellants.

Joseph S. Cage, Jr., U.S. Atty., John R. Halliburton, Asst. U.S. Atty., Shreveport, La., H. Richmond Fisher, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., Elizabeth A. O'Conwell, Asst. U.S. Atty., New Orleans, La., for U.S.

Camp, Carmouche, Palmer, Barsh & Hunter, David R. Frohn, Edward M. Carmouche, Lake Charles, La., for plaintiffs-appellees.

Before RUBIN, GARZA and WILLIAMS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

After a trial in which the sole issue was the amount of damages caused by the death of three persons in a plane crash,[1] the jury

---

1. The case arose out of the crash in New York of an Eastern plane in which 113 of 124 people

returned a verdict of $937,500 against Eastern Airlines in favor of Peter Calderera for the death of his mother, wife, and eight-year-old son and a verdict of the same amount in favor of Christopher Moore Calderera, who was four years old at the time of the disaster, for loss of his mother. The district court returned a verdict under the Federal Tort Claims Act against the United States, as joint defendant, in favor of Christopher for $400,000 and in favor of Peter for $797,480. On post-trial motions, the court refused to alter the jury award in favor of Peter, but reduced the award in favor of Christopher to $600,000. Eastern contends that opposing counsel took an unfair shot at it in closing argument, the trial court improperly excluded evidence of Peter's remarriage, the verdict was excessive, and the jury should have been polled post-discharge about its verdict because its award of identical amounts on each of the plaintiffs' entirely distinct claims indicates a misunderstanding of their instructions. We find no reversible error in the trial or in the court's refusal to interrogate the jury after its discharge, but we grant a new trial on the quantum of damages unless the plaintiffs accept a remittitur reducing the awards to the maxima we consider allowable on the record—$797,480 for Peter and $300,000 for Christopher.

## I.

The Caldareras' counsel concedes that he made an improper argument to the jury. The suit was tried in Lake Charles, Louisiana, home of the plaintiffs and their counsel, the claim against Eastern to a jury, and the claim against the United States to the court. In his final argument, plaintiffs' counsel told the jury:

Then he [Eastern's counsel] talked about community standards. He is coming over here from New Orleans and he is going to argue to a jury community standards, to tell you about community standards. Six years ago Mr. Weller's client took a member of our community's money for plane tickets. He put them on a plane and killed them. Then they hired a lawyer to come back to this community and tell you three words. I can sum up what Eastern Airlines' position is in this case in three words. Life is cheap. That is what they told you. Let me tell you something. Life may be cheap in New Orleans, or New York, or wherever Eastern is based, where people will slit your throat on the street to get the money out of your pocket. But life in Southwest Louisiana is precious. . . .

Eastern immediately objected to this patently improper argument, but did not ask for a mistrial. The district judge promptly instructed the jury to ignore the remark. Eastern did not object to the instruction, ask for an additional instruction, or at any time later during the trial seek a mistrial.

The only question for us is whether the judge should have ordered a new trial because the damage done by this inflammatory argument was irreparable. A trial judge is generally better able than an appellate court to evaluate the prejudice flowing from improper jury arguments. His denial of a motion for new trial based on improper statements is reversible only for abuse of discretion.[2] The district judge,

aboard were killed. In multidistrict proceedings in the Eastern District of New York, the United States conceded liability to the victims of the plane crash for the negligence of air traffic controllers at New York's Kennedy International Airport. A judgment declaring its liability to the plaintiffs in this case was entered in the Western District of Louisiana, on the same day the jury awarded damages, pursuant to the joint motion of the plaintiffs and the United States. The airline's liability to all victims of the plane crash was decided by a jury in the Eastern District of New York. The jury's verdict was affirmed on appeal to the

Second Circuit. *In re Aircraft Disaster,* 635 F.2d 67 (2d Cir.1980). After the liability determination, the damage suits of the individual plaintiffs were returned to the districts in which they had originally been brought.

2. *United States v. Sudderth,* 681 F.2d 990, 996 (5th Cir.1982) (ruling on motion for new trial immune from appeal absent abuse of discretion); *Nevels v. Ford Motor Co.,* 439 F.2d 251, 258 (5th Cir.1971) (disposition of motion for mistrial on basis of improper jury argument reversible only for abuse of discretion).

who has had long trial experience on both the state and federal bench, was best able to measure the impact of improper argument, the effect of the conduct on the jury, and the results of his efforts to control it. Our review is not only hindsight, but is based on a written record with no ability to assess the impact of the statement on the jury or to sense the atmosphere of the courtroom. Eastern's failure to move for a mistrial is also significant. By doing so, and by acquiescing in the court's corrective charge, it got a chance to see the verdict and then to seek to overturn it.[3] Accordingly, we affirm the trial judge's determination that the effect of the improper argument was sufficiently dissipated by his instruction.

## II.

■■■ This diversity case was governed by Louisiana law. Louisiana forbids evidence of remarriage in a suit seeking damages for the loss of a spouse.[4] This precept is followed in most other jurisdictions.[5] That rule binds us.[6]

■■■ The defendants argue that the Caldareras opened the door to such evidence by testimony concerning whether Peter Caldarera's emotional problems have persisted since the loss of his mother, wife, and child.

They contend that, on cross-examination, they should have been allowed to establish that his more recent emotional difficulties stemmed from his remarriage. These arguments were carefully considered by the trial judge. He found that there were alternative ways to determine, by examining the psychiatrist-witness, whether some of Mr. Caldarera's problems resulted from causes other than the deaths of his wife, mother and son, and that the prejudicial effect of evidence of the second marriage outweighed its probative value. Fed.R.Evid. 403.[7] His finding is not subject to scrutiny by an appellate Bureau of Weights and Standards that balances the factors gram for gram. The trial court may exercise judgment on the basis of his own opinion of the effect the evidence will have, considering the courtroom surroundings. We do not find reason to question his conclusion.

## III.

■■■ Eastern contends that the jury's award of exactly $937,500 in damages for each plaintiff, Peter Caldarera and his son, Christopher, indicates either that the jury misunderstood their instructions or intended to allow that sum to be divided between them. When the jury returned its verdict, the jurors were polled but no inquiry about

---

3. A motion for new trial may be served not later than ten days after the entry of judgment on the jury's verdict. Fed.R.Civ.P. 59(b). By contrast, a motion for mistrial is properly made when the event giving rise to the motion occurs.

4. *McFarland v. Illinois Central Railroad Co.,* 241 La. 15, 127 So.2d 183, 186 (La.1961); *Lofton v. Cade,* 359 So.2d 1074, 1075 (La.App. 1978); *Evans v. Chevron Oil Co.,* 438 F.Supp. 1097, 1104 (E.D.La.1977), *aff'd without opinion,* 616 F.2d 565 (5th Cir.1980).

5. Annot., 88 A.L.R.3d 926, 928–37 (1978). Even if the evidentiary rules of New York, the situs of the plane crash, governed admissibility of evidence of Peter Caldarera's remarriage, that would not avail the defendants. Like Louisiana, New York bars consideration of remarriage to reduce or mitigate damages in a wrongful death action. *Id.*

6. *Conway v. Chemical Leaman Tank Lines, Inc.,* 525 F.2d 927 (5th Cir.), *modified on reh'g,* 540 F.2d 837 (5th Cir.1976) (state law on ad-

missibility of evidence of remarriage in wrongful death action will be followed in diversity case); *Bailey v. Southern Pacific Transp. Co.,* 613 F.2d 1385, 1388 (5th Cir.) (per curiam), *cert. denied,* 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980) (following Texas law that evidence of remarriage not admissible for purposes of mitigating damages in wrongful death action). *Contra Papizzo v. O. Robertson Transp., Ltd.,* 401 F.Supp. 540 (E.D.Mich.1975) (admissibility of evidence of remarriage in wrongful death action is procedural question, governed by federal law).

7. Fed.R.Evid. 403 reads:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the amount was requested or made. Seventeen days after the jury had been discharged, Eastern sought to have the court ask the jury the meaning of its verdict. Counsel have found no authority for the court to inquire, after the jurors' discharge, into whether they really meant what they said. Neither have we. Post-trial inquisition of jurors is not favored,[8] unless there is some showing of prejudicial intrusion into the jury process that may have affected the verdict.[9] We cannot condemn the verdict as defective on its face because the awards were identical, even though the elements of damages sought by the respective plaintiffs differed. The trial court was "satisfied that there was no mistake as to the jury's intention."[10] We will not, therefore, order a new trial on a possibility that did not even occur to counsel until the jury had been discharged.

### IV.

Eastern argues, alternatively, that the jury verdict should be set aside as excessive. Because the trial judge was required to determine the plaintiffs' damages and to enter a judgment for that amount against the United States, he calculated independently the recompense due to the plaintiffs for their losses. He recognized that, by his calculations, the jury award to Peter was generous. He chose, however, to grant a remittitur only on the award to Christopher, and he reduced this to $600,000, reasoning that a jury award up to $200,000 more than his own calculation of a reasonable award should be allowed to stand.[11]

For the purpose of assessing damages against the United States, the judge itemized the damages Peter Caldarera suffered as follows:

| | |
|---|---:|
| Loss of companionship, love, and affection and physical and mental anguish as a result of the death of his 33-year-old wife | $400,000 |
| Loss of companionship, love, and affection, and physical and mental anguish from the death of his 63-year-old mother | 100,000 |
| Loss of companionship, love, and affection and physical and mental anguish from the death of his eight-year-old son | 150,000 |
| Funeral expense | 12,500 |
| Property damage | 500 |
| Loss of services by his wife | 134,021 |
| | $797,021 |

The trial judge calculated that Christopher had suffered damages of $400,000 as a result of the loss of the companionship, love, affection, nurture, guidance, and support of his mother, and his physical and mental anguish consequent to his mother's death. Louisiana law does not give Christopher a cause of action for the loss of his brother and grandmother.[12] The facts found by the district judge affecting the determination of damages are set forth in his opinion.[13] They are, indeed, compelling. The district judge's assessment of the damages, being findings of fact, are, of course, shielded against reversal unless "clearly erroneous."[14] Because the assessment of damages for grief and emotional distress is so dependent on the facts and is so largely a matter of judgment, we are chary of substituting our views for those of the trial judge. He has seen the parties and heard the evidence; we have only read papers.

The jury's assessment of damages is even more weighted against appellate reconsideration, especially when, as in the case of the award to Peter Caldarera,

---

8. *Stein v. New York,* 346 U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953).

9. *Wilkerson v. Amco Corp.,* 703 F.2d 184 (5th Cir.1983); *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304 (5th Cir.1977); *United States v. Riley,* 544 F.2d 237 (5th Cir.1976).

10. *Caldarera v. Eastern Airlines, Inc.,* 529 F.Supp. 634, 642 (W.D.La.1982).

11. On behalf of Christopher, Peter Caldarera has accepted the verdict as reduced, waiving the right to a new trial.

12. *See* La.Civ.Code Ann. art. 2315 (West Supp. 1982).

13. 529 F.Supp. at 637–40.

14. Fed.R.Civ.P. 52(a).

the trial judge has approved it.[15] We do not reverse a jury verdict for excessiveness except on "the strongest of showings."[16] The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason,"[17] so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive,"[18] or as "clearly exceed[ing] that amount that *any* reasonable man could feel the claimant is entitled to."[19] Nonetheless, when a jury's award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so.[20] Our power to grant a remittitur is the same as that of the district court. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded.[21]

 The loss of a loved one is not measurable in money. Human life is, indeed, priceless. Yet the very purpose of the lawsuit for wrongful death is to fix damages in money for what cannot be measured in money's worth. Unless we are to accept any verdict, in whatever amount, as a legally acceptable measure, we must review the amount a jury or a trial court awards. Reassessment cannot be supported entirely by rational analysis. It is inherently subjective in large part, involving the interplay of experience and emotions as well as calculation. The sky is simply not the limit for jury verdicts, even those that have been once reviewed.

 We look first to the award for Peter Caldarera. Acknowledging the speculation involved both in predicting increases in the minimum wage rate over time and in choosing a discount rate to reduce long-term damages to present value, the district court set a present value of $100,000 on Peter Caldarera's loss of his wife's future services. This figure was the estimated cost of replacing those services.[22] Less uncertainty attended valuation of loss of her services from her death until the date of trial. In accordance with the expert testimony of an economist, the trial judge awarded $34,021 for that loss. The parties stipulated that property damage and funeral expenses amounted to $13,459. The trial judge set the total amount allowable for loss of Peter's wife's services, funeral expenses, and property damage at $147,021. Because this sum represents an estimate of the economic value of goods and services, without any emotional overlay, the jury's award for these items of damage should

**15.** *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 934 (5th Cir.1982).

**16.** *Martin v. City of New Orleans,* 678 F.2d 1321, 1327 (5th Cir.1982); *Shows,* 671 F.2d at 934; *Bridges v. Groendyke Transport, Inc.,* 553 F.2d 877, 880 (5th Cir.1977).

**17.** *Complete Auto Transit, Inc. v. Floyd,* 249 F.2d 396, 399 (5th Cir.), *cert. denied,* 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958).

**18.** *Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 364 (5th Cir.1980).

**19.** *Bridges,* 553 F.2d at 880 (emphasis in original).

**20.** *Howell v. Marmpegaso Compania Naviera,* 536 F.2d 1032, 1034–35 (5th Cir.1976). *See, e.g., Shingleton v. Armor Velvet Corp.,* 621 F.2d 180, 182, 184 (5th Cir.1980) (per curiam) (appellate court remitted jury verdict because of obvious jury miscalculation); *Stapleton v. Kawasaki Heavy Industries, Ltd.,* 608 F.2d 571, 574 (5th Cir.1979), *modified on another ground,* 612 F.2d 905 (5th Cir.1980) (trial court directed to enter specified remittitur of jury verdict in amount less than it had previously entered); *Abernathy v. Southern Pacific Co.,* 426 F.2d 512, 514–15 (5th Cir.1970) (trial court directed to enter specified remittitur of jury verdict).

**21.** *Carlton v. H.C. Price Co.,* 640 F.2d 573, 582 n. 14 (5th Cir.1981); *Stapleton v. Kawasaki Heavy Industries, Ltd.,* 608 F.2d 571, 574 n. 7 (5th Cir.1979), *modified on another ground,* 612 F.2d 905 (5th Cir.1980).

**22.** *See Ayala v. Bailey Elec. Co.,* 318 So.2d 645, 652 (La.App.), *writ issued,* 322 So.2d 770 (La. 1975) (determining cost of replacing services is one method of measuring value of loss).

have corresponded closely to this figure. The judge set the amount for Peter's loss of his 63-year-old mother at $100,000 and for the loss of his eight-year-old son at $150,000. These awards are generous, but they cannot be viewed as excessive. If we add 50% to each, however, we arrive at an amount that appears to us to be a maximum. Even when we take into account the trauma sustained by Mr. Caldarera as a result of the multiple loss he suffered in a single catastrophe, we consider that the maximum verdict against Eastern that the trial judge should have permitted to stand, without remittitur, for Peter's loss of his mother was $150,000, and, for the loss of his son, $225,000.

▪ The sum of $400,000 awarded by the trial judge to Peter Caldarera for the loss of the companionship, love, and affection of his wife is substantially greater than any we have discovered for the emotional damages resulting from loss of a spouse save one Seventh Circuit decision refusing to reduce a jury verdict of $419,000 for loss of a husband.[23] While the factfinder may well deem the loss of a spouse more griev-

ous than the loss of a mother or son, and thus deserving of greater compensation, on the record in this case, we consider the sum of $250,000 to be the maximum award that could be allowed for the emotional losses arising from the death of Mrs. Caldarera, apart from the economic loss. This is equivalent to an annuity of $21,231 per year for each year of Peter's remaining life expectancy for his emotional loss alone.[24] The maximum total sum that we think Peter Caldarera could be awarded is thus computed:

| | |
|---|---|
| Death of mother | 150,000 |
| Death of son | 225,000 |
| Death of wife | 250,000 |
| Other damages | 147,021 |
| | $772,021 |

▪ The district judge awarded a total of $797,480, with a somewhat different allocation of the amounts for individual items. This total is so close to the amount we have computed, albeit in a different fashion, that we affirm the award against the United States. However, the total is likewise, for

23. *E.g., Cheatham v. City of New Orleans,* 378 So.2d 369, 377 (La.1979) (jury award of $200,000 for 22-year-old widow's loss of love and affection of 27-year-old husband was reinstated after trial judge reduced award to $50,000); *Sibley v. Menard,* 398 So.2d 590 (La.App.1980), *writ denied,* 400 So.2d 211 (La.1981), *aff'd on reh'g,* 404 So.2d 980 (La.App.1981) (widow awarded $100,000 for loss of husband's love and affection); *Domangue v. Eastern Air Lines, Inc.,* 542 F.Supp. 643 (E.D.La.1982) (widow received $100,000 for loss of husband's love, affection, and companionship after 10-year marriage); *Szimonisz v. United States,* 537 F.Supp. 147 (D.Or.1982) (widow received $100,000 for loss of husband's society and companionship); *Faust v. South Carolina Hwy. Dept.,* 527 F.Supp. 1021 (D.S.C.1981) (widow received $60,000 for loss of husband's love, affection, care, attention, companionship, comfort, and protection); *Stanford v. McLean Trucking Co.,* 506 F.Supp. 1252 (E.D.Tex.1981) (widower of one decedent received $75,000 for loss of wife's consortium and society, and widower of other decedent received $100,000 for loss of wife's consortium and society); *Abille v. United States,* 482 F.Supp. 703 (N.D.Cal.1980) (widow received $55,000 for loss of husband's care, comfort, and consortium); *Wyatt v. United States,* 470 F.Supp. 116 (W.D.Mo.), *aff'd,* 610 F.2d 545 (8th Cir.1979) (per curiam) (widower awarded $111,211 for loss of love, companionship, and consortium of wife with life expectancy of 12.2 years). *But see Huff v. White Motor Corp.,* 609 F.2d 286, 297 (7th Cir.1979) (Total award for loss of husband to whom the plaintiff had been married for 30 years was $700,000. Eliminating pecuniary loss, the court found the balance $414,400 to be for loss of husband's love, affection, counsel. It said, "Therefore, although we are left with the uncomfortable feeling that the verdict is too high, we think we would be exceeding the limits of our authority if we were to disturb it.").

24. This is based on the assumption that Peter Caldarera had a life expectancy of 37.8 years and that the funds could be invested at 8% per annum, which is somewhat less than the current rate paid on 52-week U.S. Treasury bills. The trial judge's award of $400,000, by the same computation, would be equivalent to an annuity of $33,970 per year. If invested in long-term tax-exempt municipal bonds, now available at a yield of 9% per annum, an award of $250,000 would produce $22,500 a year free of federal income tax, without invading principal, and an award of $400,000 would produce $36,000 annually, without invasion of the principal.

the reasons we have expressed, the maximum that we think any reasonable jury could have awarded. We find the jury award in excess of this sum to be so gross as to be contrary to reason and must, therefore, reverse the trial judge's action in denying the motion for a new trial. We do not overlook the calamitous effect of the simultaneous bereavement. While the hurt was literally unmeasurable, we must deal with it in such measure as is here sought and is the law's only recompense, a valuation in dollars. We, therefore, order a new trial unless Mr. Caldarera is willing to accept a remittitur of the award against Eastern to the total amount of $797,480. We affirm the judgment in his favor against the United States in this amount. If Mr. Caldarera is unwilling to accept the remittitur on the Eastern claim, he may have a new trial on his claim against it.

We must also review the award for Christopher's loss of his mother. Christopher was then four years old, in normal health, and required no exceptional care. The verdict, even as reduced by the remittitur, exceeds any amount that a reasonable person could have awarded him. Our judgment is that his award should not exceed $300,000, which is equivalent to an annuity of $24,986 a year for each year of his mother's full life expectancy.[25]

We, therefore, order a new trial of the claims against Eastern unless Mr. Caldarera, as tutor for his minor son, will accept a remittitur of the verdict against Eastern to the amount of $300,000, and, in his own behalf to the amount of $797,480. We affirm the judgment against the United States in favor of Mr. Caldarera for $797,-480, and, reducing the amount to $300,000, affirm the judgment against the United States in favor of Christopher Caldarera.

For these reasons, the case is REMANDED to the district court for further proceedings in accordance with this opinion.

25. This is based on the assumption that Mrs. Caldarera had a life expectancy of 42.4 years and that the funds could be invested at 8% per annum, which is somewhat less than the current rate on 52-week U.S. Treasury bills. However, if invested in long-term municipal bonds, the sum could be invested in federally tax-exempt securities yielding 9% per annum and could produce $27,000 a year free of federal income tax without invasion of the principal.