**Amparo Viuda DE CENTENO, et al.,**
**Plaintiffs-Appellees,**

**v.**

**GULF FLEET CREWS, INC., et al.,**
**Defendants-Appellants.**

**No. 85–3124.**

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1986.

Michael A. McGlone, Lemle, Kelleher, Kohlmeyer, et al., New Orleans, La., for defendants-appellants.

Arnold R. Ginsberg, Miami, Fla., Fine, Waltzer & Bagneris, Bruce C. Waltzer, Frank M. RePass, III, New Orleans, La., for plaintiffs-appellees.

Before GOLDBERG, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Gulf Fleet Crews, Inc. (Gulf Fleet) appeals a judgment entered on a verdict against it for $776,000 under the Jones Act. We affirm the jury's verdict of liability under the Jones Act, but vacate the damage award and remand for a new damages trial. We first review the facts developed at trial that are most favorable to the verdict.

## I.

In November 1980, Gulf Fleet employed Centeno, a Honduran citizen, as a cook aboard the M/V HERCULES DEL GOLFO. Centeno's one year employment agreement with Gulf Fleet provided for $34 per day compensation and granted him the right to take thirty days off without pay after a minimum of ninety days on board the vessel.

In early January 1981, the HERCULES DEL GOLFO called at Port Hueneme, California. The U.S. Coast Guard inspected the vessel and ordered the master to man the vessel with American seaman because it was an American flag vessel operating in American waters. Arrangements were made through Gulf Fleet's agent, Kenneth Hughes, to transport Centeno and the other Honduran crew-members back to Honduras. On January 11, 1981, Centeno reported to the master of the vessel that he was ill and the vessel's agent arranged for Centeno to see a local physician, Dr. Dorothy Turner. Although all of Dr. Turner's records of Centeno's visit were unavailable at trial, Gulf Fleet produced Dr. Turner's bill which indicated that she treated Centeno for influenza. Centeno returned to the ship immediately after his visit with Dr. Turner.

Randal Silcox, one of Centeno's shipmates, testified that Centeno's condition deteriorated after his visit to Dr. Turner. Silcox testified that upon returning to the ship, Centeno went straight to bed; Silcox, who was in the galley, heard Centeno moaning in pain. When Silcox visited Centeno, who spoke no English, Centeno put his hands on his abdomen, indicating pain in this area. Centeno's wife testified that she was alarmed when Centeno arrived home in Honduras on January 15 because he looked ill and emaciated. She took Centeno to a local physician, Dr. Wilfred Chavarria, that same day.

Dr. Chavarria noted the following observations of Centeno upon his initial examination on January 15, 1981:

Patient relates that for one week, he has been feeling weak, downcast, with no appetite, suffering headaches, particularly in frontal region and that he urinates a lot. He is constantly thirsty. For this reason he ingests large amounts of liquids, especially water. He has difficulty in concentrating on reading and speaking.

Based upon these observations, Dr. Chavarria ordered a blood test so that Centeno's glucose level could be determined. The tests indicated that Centeno's glucose count was almost three times the normal level. Dr. Chavarria then diagnosed diabetes mellitus and diabetic pre-coma, and took appropriate action to reduce Centeno's glucose level.

Dr. Chavarria testified that the symptoms Centeno described were typical of diabetes and that any physician confronted with a patient displaying these symptoms should have suspected diabetes and ordered a blood test to rule it out. Dr. Chavarria also testified that Centeno's general appearance indicated that his symptoms had been present for at least a week before January 15 when Chavarria first diagnosed diabetes.

Centeno's condition improved dramatically as a result of Dr. Chavarria's treatment. By January 20, Centeno's glucose stabilized at a normal level. On January 28, however, Centeno developed an acute case of diarrhea with strong stomach cramps and vomiting. Centeno apparently ingested bacteria from the local water supply in Honduras that precipitated an infection. This condition persisted and gradually in-

tensified until February 3, 1981, when Centeno died. Dr. Chavarria's medical report listed the direct cause of death as cardiac arrest, with an indirect cause being "Organic exhaustion in all respects due to diabetic pre-coma suffered by patient a few days ago."

Dr. Chavarria gave the following testimony when asked to explain how Centeno's diabetic pre-coma was related to his death:

> The diabetic pre-coma by its nature and like any serious disease reduces your organic defense to sickness or disease. Consequently, the body in this condition doesn't have the strength nor the vitality to face, with any possibilities of success, an infection or any pathological aggression.

Dr. Chavarria concluded that Centeno's death was related to the delay in the diagnosis and treatment of his diabetes:

> If Mr. Centeno would have remained in the United States under medical treatment, it is logical that his diabetes would have been controlled, and if they would have allowed him to return to Honduras in good health, with his organic defenses recovered, with his physical constitution wholesome, and, in those conditions, he would have resisted a diarrhea such as what he had.

Centeno's surviving widow and three minor children sought damages for Centeno's wrongful death under the Jones Act and the general maritime law. The survivors contended that the crew of the vessel was negligent in failing to properly attend to Centeno's medical needs and that the incompetent crew rendered the HERCULES DEL GOLFO unseaworthy. The jury found that Gulf Fleet was negligent and returned a $776,000 verdict in favor of the plaintiffs and against Gulf Fleet; the jury also found that the vessel was seaworthy and exonerated Gulf Fleet from liability under the general maritime law. In this appeal, Gulf Fleet challenges the jury's finding of negligence and attacks the award as excessive.

## II.

### A.

■ Gulf Fleet contends that the district court erred in refusing to grant its motions for a directed verdict and judgment notwithstanding the verdict on the finding of liability against it. We conclude that there is sufficient evidence to support the jury's findings that Gulf Fleet negligently failed to provide adequate medical treatment to Centeno and that such negligence was a cause of Centeno's death.

■ The legal obligation of a shipowner to attend to the medical needs of its crew is undisputed: A shipowner has a duty to provide prompt and adequate medical care to its seamen. *DeZon v. American President Lines, Ltd.,* 318 U.S. 660, 667–68, 63 S.Ct. 814, 818–19, 87 L.Ed. 1065 (1943); *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 684 (10th Cir.1981); *Picou v. American Offshore Fleet, Inc.,* 576 F.2d 585, 587 (5th Cir.1978).

■ If the jury accepted Dr. Chavarria's testimony, which it apparently did, it was entitled to find that Centeno's diabetic symptoms were present when he visited Dr. Turner. The jury was also entitled to find that these symptoms should have alerted Dr. Turner to order a blood test which would have revealed the diabetes. A shipowner is vicariously responsible for the negligence of a physician it chooses to treat its seaman. *Central Gulf Steamship Corp. v. Sambula,* 405 F.2d 291, 302 (5th Cir.1968); *Joiner v. Diamond M Drilling Co.,* 688 F.2d 256, 262 n. 9 (5th Cir.1982).

The jury was also entitled to find that the ship's officers were negligent in failing to seek additional medical treatment for Centeno following his return to the ship from his visit to Dr. Turner. Dr. Chavarria's testimony that if Centeno had received proper treatment in the United States for diabetes he could have resisted the organic infection that caused his death provided the necessary causal link between the negligent failure to treat Centeno and his death.

## B.

■ Gulf Fleet next contends that the unitemized $776,000 award to Centeno's survivors is excessive. Gulf Fleet correctly asserts that appellant was limited by the Jones Act to recovery of pecuniary losses. *In re Merry Shipping, Inc.*, 650 F.2d 622, 624 (5th Cir.1981). Recoverable items include loss of support from Centeno's past and future earnings; loss of Centeno's household services; loss of parental nurture and guidance of his minor children until the age of majority; and recovery for Centeno's predeath pain and suffering. *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524 (5th Cir.1979) (en banc).

■ In evaluating whether the jury's award is excessive, we are mindful that assessment of damages is for the trier of fact, and "in this area the appellate court should step lightly or not at all." *In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982, (Giancontieri)*, 767 F.2d 1151, 1155 (5th Cir.1985). In *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 783–84 (5th Cir.1983) we stated:

> We do not reverse a jury verdict for excessiveness except on "the strongest of showings." The jury's award is not to be disturbed unless it is entirely disproportionate to the injuries sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to."

By the same token, "the sky is simply not the limit for jury verdicts." *Id.* at 784. Appellants' argument requires us to consider the evidence relating to each item of recoverable damages.

### 1. Loss of Support

Centeno was paid $34 per day by Gulf Fleet under the terms of his employment contract. This was verified by Gulf Fleet's payroll records. Appellees' argument to the jury and to us on appeal that the payroll records reflect that Centeno earned $1530 per month—instead of $1020 per month based on wages of $34 a day—is patently erroneous. The employment record appellees rely on shows earnings of $1530 for a *forty-five day* period or $34 per day.

The following are the maximum amounts appellants could recover for loss of support:

A. Loss of support from date
of death until the date
of trial ..................... $ 47,566.00 [1]
B. Loss of future support ..... $170,680.94

In arriving at this latter figure we assume that Centeno would work until age 65 or eighteen years following the trial. We project annual earnings of $12,410 ($34 per day times 365 days) for eighteen years and discount the sum at the stipulated rate of three percent. For present purposes, we do not decide what amount, if any, should be deducted for taxes or for sums spent by Centeno for his own use. *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *Law v. Sea Drilling Corp.*, 523 F.2d 793, 794 n. 3 (5th Cir.1975).

### 2. Loss of Nurture and Guidance for the Three Minor Children

Centeno had three surviving minor children, Corbin, Elena and Griselda, whose ages at the time of trial were eleven, nine and seven, respectively.

In computing the maximum allowable award for loss of support, we accepted appellant's argument that Centeno would have worked aboard ship twelve months per year. Under this assumption, the record will not support a substantial award for loss of nurture and guidance. We have

---

1. Centeno died on February 3, 1981, and the jury returned its verdict on December 7, 1984, a period of three years, ten months and four days. At $34 per day the total comes to $47,566.

either expressly or implicitly approved awards for this element of damages ranging from $30 per month per child in *Neal v. Saga Shipping Co.*, 407 F.2d 481, 487 (5th Cir.1969), to $2,000 per year per child in *Solomon v. Warren*, 540 F.2d 777, 787 (5th Cir.1976). Considering the limited time Centeno had available to spend with his children, the record will not support a larger award in this case than $2,000 per year per child until they reach majority. Thus, the maximum permissible awards for loss of nurture and guidance are: Corbin $14,-000; Elena $18,000; and Griselda $22,000 for a total of $54,000. The award for this item for each child for the three years and ten months between Centeno's death and the trial (3⅚ × $2,000 for each child) is $7,660 each.

Thus, the total award permissible under this evidence for loss of past and future nurture and guidance for the three children is $76,980.

### 3. Loss of Services

Mrs. Centeno is also permitted to recover the monetary value of any household services Centeno would have performed during his life expectancy had he lived. Again, no substantial award can be permitted for this item under the assumption made earlier that Mr. Centeno would work continuously aboard ship. We conclude that the maximum the jury could have awarded for loss of household services was $1,000 per year. This amounts to approximately $3,800 for loss of services before the trial and $1,000 per year times Centeno's twenty-five year life expectancy discounted by the stipulated three percent rate or a total of $17,413.10 for loss of future services. Thus, the maximum the jury could have awarded for loss of past and future services was $21,213.10.

### 4. Pre-death Pain and Suffering

The only remaining recoverable item of damage is for the pain and suffering Centeno suffered before his death.

The record reveals that twenty-three days elapsed from the time Centeno consulted Dr. Turner in California until his death. Centeno's predominant symptoms were weakness, dehydration and debilitation. During the four days after Centeno consulted Dr. Turner and before he returned home, the record reflected that he complained of pain in his stomach and abdomen. Mrs. Centeno testified that her husband experienced pain when he first arrived home, particularly when he tried to walk. The detailed records of Dr. Chavarria reflect no acute distress during the nineteen days Centeno was in his care until he contracted diarrhea five days before his death.

As indicated above, the maximum award permissible for the losses of support, services and nurture and guidance is $316,-440.04. Thus $459,559.96 of the jury's $776,000 award is attributable to Centeno's pre-death pain and suffering. We conclude that this sum is approximately twice the amount the jury was entitled to award for Mr. Centeno's pain and suffering.[2]

Having determined that the award is excessive, we must next decide whether to enter a remittitur or order a new damage trial. See Wright & Miller § 2820, p. 133.

For reasons that follow, we exercise our discretion to remand this case to the district court for a new damage trial. Because the jury was not directed to return an itemized award in response to special interrogatories, the jury returned a lump sum verdict which gives us no insight into the amount of damages the jury allowed on each item. This insight would be particularly helpful in this case on two items: Appellant's counsel in closing argument requested $800,000 for loss of love and affection. This non-pecuniary item was not recoverable under the jury's finding that the vessel was not unseaworthy but given the amount of the award, the distinct possibility exists that the jury erroneously included sums for this item in its award. Also,

2. In closing argument appellees' counsel asked the jury to award $100,000 for Centeno's pain and suffering.

appellee's counsel had no legitimate grounds to argue that Centeno had annual earnings of $18,000 at the time he left the employ of appellant. As we point out above, the evidence was uncontradicted that Centeno's annual earnings while employed with appellant were $12,000. If the jury accepted this 50% overstatement of Centeno's annual earnings, the award for loss of support was erroneously inflated.

■ In this circumstance where we cannot determine the reason the verdict is excessive—because it is unclear whether the jury improperly awarded sums for loss of love and affection or whether it simply awarded excessive sums for legally recoverable items of damage—we elect to remand this case for a new damage trial. *See In re Air Crash Disaster at New Orleans, Louisiana on July 9, 1982 (Eymard)*, 795 F.2d 1230, 1235–37 (5th Cir.1986); 6A *Moore's Federal Practice* § 59.08[6, 7].

Accordingly, the liability feature of the judgment is AFFIRMED; the damage award is VACATED and the case is REMANDED for a new trial on damages only.

AFFIRMED IN PART, VACATED IN PART and REMANDED.