**Pamela J. DOUGLASS, et al**

v.

**DELTA AIR LINES, INC.**

**Civ. No. SA–88–CA–0043.**

United States District Court,
W.D. Texas,
San Antonio Division.

March 14, 1989.

R. Jack Ayres, Jr., Diane F. Walker, Law Offices of R. Jack Ayres, Jr., Dallas, Tex., for Douglass.

R. Jack Ayres, Jr., Law Offices of R. Jack Ayres, Jr., Dallas, Tex., for Takus.

James D. Guess, Ron A. Sprague, Groce, Locke & Hebdon, San Antonio, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

## I. INTRODUCTION

This wrongful death action is brought by the surviving wife and children of Michael G. Douglass, arising out of the death of Mr. Douglass on August 2, 1985. Mr. Douglass was a passenger on Delta Air Lines Flight 191, an L–1011 jet, which

crashed on its final approach to the Dallas–Ft. Worth International Airport. The suit is brought by Pamela Douglass, the surviving widow of Mr. Douglass, on her own behalf and as next friend of the three children of the marriage. Also named as a Plaintiff is Stephen Takus, as Independent Executor of the Estate of Michael Douglass, who seeks to recover for any conscious pain and suffering that Mr. Douglass suffered immediately before his death.

In a stipulation filed by the parties and appended to the signed Amended Pre–Trial Order entered on December 1, 1988, Delta Air Lines agreed not to contest liability in this matter, and to pay any compensatory damages found by this Court (subject to their retained right to appeal). In return, Plaintiff agreed not to seek the recovery of anything but compensatory damages, and to dismiss all other Defendants from the case. This matter is therefore before the Court solely on the issue of damages.

## II. FINDINGS OF FACT

The parties agreed in their Amended Pre–Trial Order (entered by the Court on December 1, 1988) that numerous facts and issues were not in genuine dispute and were established either by stipulations or admissions of counsel. Those uncontested facts are set out on pages 4 through 8 of the pre-trial order. The Court hereby adopts as Findings of Fact those matters set out in the Amended Pre–Trial Order as described above. To the extent that it may be found that the uncontested facts adopted by this Court are inconsistent with the Findings of Facts set out below, the Findings of Facts set out below shall control.

### A. *Parties and Procedural Background*

1. This suit began with the filing of a petition in state district court in Dallas, Texas. That action was removed to federal court and subsequently transferred to the Northern District of Texas pursuant to the order of the judicial panel for multi-district litigation. After the parties reached the agreement set out in the stipulation de-

scribed above, the suit was transferred to the United States District Court for the Western District of Texas, San Antonio Division. The case was then transferred to this Judge, and a trial to the Court was held from November 30, 1988 to December 7, 1988.

2. Mr. Douglass was survived by his wife, Pamela J. Douglass, and their three children, Christopher Michael Douglass, Byron Scott Douglass, and Jennifer Lee Douglass. Mrs. Douglass has brought this suit on behalf of herself and her children, and the Court finds Mrs. Douglass properly represents the minor Plaintiffs herein.

3. Stephen Takus was named as Independent Executor in the will of Michael G. Douglass and is lawfully authorized to represent the Estate of Michael Douglass in this case. As stipulated by the parties, the estate of Michael G. Douglass has sustained actual property damages in this case in the amount of $500.00, representing the value of Mr. Douglass' clothing and personal property lost in the crash. Mr. Takus is also attempting to recover for any mental anguish or conscious pain and suffering experienced by Mr. Douglass immediately prior to his death.

4. The parents of Michael Douglass predeceased him and no other collateral kindred known to Plaintiffs have any claim in connection with this lawsuit. The only Plaintiffs asserting a claim in this case are as noted above, the surviving widow and children of Mr. Douglass, as well as the Executor of Mr. Douglass' estate.

### B. *Family Background*

5. On August 2, 1985, Michael G. Douglass was a passenger on Delta Air Lines Flight 191. That airplane crashed at Dallas–Ft. Worth International Airport while attempting to land. As a result of that crash, Michael G. Douglass died on August 2, 1985.

6. Michael Douglass was born on April 27, 1945, and was 40 years old on the day of his death.

7. Michael Douglass graduated from high school in 1963, and attended the Univ-

ersity of California at Santa Barbara from 1963 to 1967. He obtained his Bachelor of Arts Degree in Economics in 1967. From 1968 to 1969, Mr. Douglass served in the United States Army as a First Lieutenant. He was stationed at that time in Korea. From 1969 to 1970, Mr. Douglass attended the Thunderbird Graduate School of Management in Glendale, Arizona. He then joined the Federal Bureau of Investigation, and his first assignment was in San Antonio, Texas. It was during this assignment that Mr. Douglass met Pamela Berger, who eventually became Mrs. Pamela Douglass. In 1972 Mr. Douglass was transferred to Washington, D.C., where he attended language school through the Federal Bureau of Investigation. He was then sent to Puerto Rico where he served on a special bank robbery squad. Mr. Douglass was on the S.W.A.T. team for the F.B.I. in Puerto Rico, an assignment for which he volunteered. While in Puerto Rico, Mr. Douglass attended the Inter American University of Puerto Rico and obtained a Master's in Business Administration. After completing his assignment in Puerto Rico, Mr. Douglass was transferred to the Miami F.B.I. office. He served as an agent in Miami until 1978.

8. After leaving the F.B.I., Mr. Douglass went to work for Cutter Labs, Inc. in Los Angeles, California, where he served as a large account salesman and a sales staff trainer. In 1980 Mr. Douglass acquired Crystal Clear Paging in San Antonio, Texas. He served as general manager of Crystal Clear Paging until 1981, when he went to work for the NALCO Chemical Company as a chemical salesman. In 1983, Mr. Douglass left the NALCO Chemical Company to go to work for Page America in Tulsa, Oklahoma. He served as the sales/communications manager of operations for Page America until 1984. In 1984, Mr. Douglass moved back to San Antonio, and served as the Regional Sales Manager of Metromedia, Inc. In June of 1985, Mr. Douglass was promoted to the Regional Vice-President of Sales for Metromedia, Inc./Network One, in Ft. Lauderdale, Florida. This is the position that Mr.

Douglass held at the time of his death in August, 1985.

9. Pamela Douglass was born in San Antonio, Texas. She attended Incarnate Word College, and after graduation, taught in the Northeast Independent School District in San Antonio for approximately five years. During that time she obtained her Master's Degree from Incarnate Word. Pamela Douglass met Michael Douglass in San Antonio in 1971. Mrs. Douglass testified that she knew from an early point in their relationship that she would eventually marry Mr. Douglass. In the fall of 1971, Pamela and Michael Douglass were engaged, and they were married on January 15, 1972 in Austin, Texas.

10. Pursuant to an assignment by the F.B.I., the Douglasses moved to Puerto Rico in 1972. The Douglasses at this time met the Fritzes. Mr. Fritz was also an F.B.I. agent assigned to the Puerto Rico bank robbery detail. Patricia Fritz and Pamela Douglass became close friends. The Douglass' first child, Christopher, was born April 23, 1974, while the Douglass' lived in Puerto Rico. Mrs. Fritz, who testified at the trial of this case, stated that Mr. and Mrs. Douglass were very close during all the times she was acquainted with the Douglasses. She stated that the marriage was a very strong marriage and that it was apparent that both Mr. and Mrs. Douglass loved each other very much.

11. The Douglass' second child, Byron, was born on January 17, 1976, while the Douglasses were living in Miami, Florida. Their third child, Jennifer, was born on December 17, 1979, when the Douglasses were residing in San Antonio, Texas.

12. Michael Douglass left the F.B.I. in 1978 in order to become a sales representative for Cutter Labs, Inc. Mrs. Douglass stated that the reason Mr. Douglass left the F.B.I. was mainly financial, as he felt that his F.B.I. salary was not sufficient to raise his family in the manner in which he wished to raise them. He agonized over the decision to leave the F.B.I., and it took him two years to finally decide that was the course he wished to pursue.

13. Mr. Douglass was an extremely successful businessman and executive. It is apparent from his personnel records, as well as the testimony of co-workers and superiors, that he was an exceptional employee, manager, and businessman. Indeed, at the time of his death, Mr. Douglass was on the upward slope of what appeared to be a quickly rising career path. Shortly before his death he had been promoted from the position of Regional Sales Manager to the Regional Vice-President for Sales of a new branch of Metromedia, Inc. His salary had markedly increased in this new position, and his prospects for further promotions were very good.

14. The new position which Mr. Douglass held at the time of his death necessitated his moving the family from San Antonio to Ft. Lauderdale, Florida. The Douglasses had decided to build a house in Ft. Lauderdale, and during the time that the house was being built, Mr. Douglass was commuting back and forth from San Antonio to Ft. Lauderdale. On the day of his death, Mr. Douglass was returning from Ft. Lauderdale to spend the weekend with his family. Mr. Douglass had originally been scheduled to fly on a Continental flight that would have arrived in San Antonio at approximately 4:00 p.m., but because he needed to complete meetings on salary raises for his staff in Florida, he canceled that earlier flight and made arrangements to be a passenger on Delta Flight 191.

15. It was apparent from all of the testimony that Michael Douglass was a dedicated, devoted and loving father. The children all had close relationships with their father, and Mrs. Douglass relied upon him not only for financial support but also for a great deal of assistance in raising the children, and for emotional support.

### C. *Mental Anguish*

16. Mrs. Douglass and the three children have suffered significant mental anguish as a result of the death of Michael Douglass. Mrs. Douglass began consulting Dr. Rycke Marshall, a psychologist, beginning in 1986. Dr. Marshall is a licensed clinical psychologist in private practice in Dallas, Texas. She obtained her Bachelor's and Master's degrees in Psychology at Southern Methodist University, and obtained her Ph.D. from The University of Texas Health Science Center in Dallas, Texas, in 1975. From 1975 to the present, Dr. Marshall has been an Associate Professor in the Department of Psychiatry in the Division of Psychology at the University of Texas Health Science Center in Dallas. She has published numerous papers, and her speciality is the psychology of loss. The Court finds Dr. Marshall eminently qualified in her field and accepts her opinions as to the loss suffered by Mrs. Douglass. Indeed, these opinions were essentially uncontroverted by the Defendant.

17. Dr. Marshall testified that Mrs. Douglass is significantly depressed as a result of the death of Mr. Douglass, and has had a difficult time accepting and adjusting to that death. Mrs. Douglass has depressive episodes, as well as hopeless feelings. She has lost sleep and has appetite disturbances as a result of the death. Further, Mrs. Douglass has been socially withdrawn since her husband's death. Mrs. Douglass has maintained a very active schedule, to the point of being compulsive or obsessive about her activities. She has attempted to present a very strong front, especially before her children. Dr. Marshall testified that the result of these defensive mechanisms is that Pamela Douglass has yet to truly deal with her husband's death. She finds that Pamela Douglass does not see any hope of her life getting better. She also testified that Pamela Douglass has had a very difficult time being a single parent, and she is very concerned about the prospect of being a single parent of two adolescent boys. Dr. Marshall's impression was that the marriage of Pamela and Michael Douglass was very strong, and that Pamela Douglass was very happy with her role as wife and mother in a traditional marriage.

18. Dr. Marshall stated that Pamela Douglass' progress has been less than what she had hoped for, and that three years after the crash of Delta Flight 191, Pamela Douglass has not yet been able to adjust to life without her husband. Indeed,

18 months after the accident, Mrs. Douglass was still having nightmares and sleep and appetite disturbances, and anti-depressants were prescribed by Dr. Marshall for a period of time. Dr. Marshall testified that Mrs. Douglass' recovery has been complicated by the fact that she is a very private person and does not open up easily. In sum, Mrs. Douglass' life has been drastically changed as the result of the crash of Delta Flight 191. Mrs. Douglass has suffered severe mental anguish, and will continue to suffer that same anguish in the future.

19. Dr. Marshall stated that if she had to divide the suffering that Mrs. Douglass has encountered between that suffered prior to the date of her testimony, and that which would be suffered in the future, she would assign 60% of the suffering to time before trial, and 40% to be faced in the future.

20. Mrs. Douglass testified during the trial. Although she attempted to maintain her composure, it was obvious that she has suffered tremendous grief since Mr. Douglass' death. The record surely does not reflect what a person in the courtroom could see and feel. The overall impression that the Court received from her testimony is that she is a courageous woman who has done very well managing a family with three children in less than favorable circumstances. She has been forced to pay for her efforts, however, in the form of mental strain and fatigue, and it is clear that the sudden death of her husband has caused, and will continue to cause her, great mental anguish.

21. Dr. Richard F. Dangle testified concerning the effect of the accident on the Douglass children. Dr. Dangle received his Bachelor of Arts Degree in Social Science in 1971 from Michigan State University, and received his Master's of Social Work in 1973 from the University of Michigan. He obtained his Ph.D. in Developmental and Child Psychology from the University of Kansas in 1978. He is licensed by the State of Texas as a Psychologist, and is a Certified Social Worker, Advanced Clinical Practitioner in the State of Texas. He is currently the Chairman of the Direct Practice Sequence at the Graduate School of Social Work for The University of Texas at Arlington. He has taught at The University of Texas at Arlington in the Graduate School of Social Work since 1977. He has presented numerous papers, and has a long list of publications, mainly focusing upon child psychology. The Court found Dr. Dangle eminently qualified in his field, and as with Dr. Marshall, his testimony was essentially uncontroverted by the Defendant.

22. Dr. Dangle stated that the only event that can be more catastrophic to a child than the accidental death of one of their parents is the suicide of a parent. Thus, according to Dr. Dangle, the death of Mr. Douglass was a truly catastrophic event that will have far-reaching consequences throughout these childrens' lives. Dr. Dangle interviewed both the children and Mrs. Douglass in order to present his evaluations. He was also aided by the psychological evaluations and testing completed by his colleague, Dr. Steven E. Greer. Dr. Dangle met first with Mrs. Douglass to explain the testing that would be done, and to make her comfortable with the evaluations. Dr. Dangle then met with the children in his clinic in Dallas where they were evaluated and tested.

23. Approximately three months later, Dr. Dangle traveled to San Antonio, and met with the Douglass children and Mrs. Douglass in their home. Dr. Dangle's general observations were as follows: The Douglass family is a very close family, and they care for each other a great deal. Nevertheless, Dr. Dangle found the family to be under a great deal of stress, and concluded that the family had not yet dealt with the loss of their father. Dr. Dangle evaluated all of the children and Mrs. Douglass insofar as her ability to parent and act as a mother for the children.

24. Dr. Dangle found Mrs. Douglass outwardly strong, but inwardly very frightened, exhausted, and anxious. Mrs. Douglass spends evenings wandering about the house, rethinking every decision she has made concerning the children. She ques-

tions her ability to parent the children by herself. She does everything possible to avoid showing her children her vulnerability, and her doubts. She has communicated much of this "putting on a strong face" to the children, and the children have also not displayed outwardly their grief concerning Mr. Douglass' death.

25. Of the three children, Dr. Dangle found that the oldest, Christopher, showed the most serious adverse affects of the loss of Mr. Douglass. The death of his father has moved Christopher into a new role in the family, being the oldest male. Christopher is a ninth grader at Churchill High School in San Antonio, Texas, and is 13 years old. Nevertheless, he has been forced to step into the shoes of an adult male, thus skipping over many of the normal adolescent emotions and stages. The psychological testing done on Christopher shows that he is an angry and emotionless child, and that he is very lonely. The effect of being forced into the dominant male role in the family is that Christopher, like his mother, is very exhausted. He, too, strives to stay in control, and thus does not express his emotions concerning the loss of his father. Dr. Dangle testified that the effect this has had on Christopher is that he is essentially an emotionless child. Nevertheless, Christopher is making As and Bs in school and there is no indication that he has had any behavior problems at school. Dr. Dangle stated that there is no question that Christopher has suffered severe mental anguish and will continue to suffer such anguish.

26. Dr. Dangle found the second child, Byron, to have weathered the immediate effects of the death of his father much better than has his older brother, Christopher. This was consistent in his view with the status of Byron as the second child. Byron, unlike Christopher, is a gregarious child, who has a hot temper. Of the three children, Byron is the most likely to attempt to test the limits set by his mother upon his activities. During his life, Mr. Douglass was able to keep Byron in check and keep a firm hand on Byron's activities. This was due in part to the similarities in the personalities and temperaments of By-

ron and Mr. Douglass. Byron was very close to his father, and followed his directions without testing. Mrs. Douglass has had a more difficult time keeping Byron in line, and Byron is more likely to push the limits set by his mother than he would were the limits set by his father. Dr. Dangle testified that Byron is likely to continue to push these limits even further as he reaches adolescence, and that the relationship between Byron and his mother is bound to be very stormy during that time. Despite the death of his father, Byron has maintained a straight A average in school this year, and he has no behavior problems that have been reported by his teachers.

27. The youngest child, Jennifer, differed from the other members of the family in her willingness to express her feelings concerning the loss of her father. She constantly vocalizes her desire to have a new father to replace the father that she has lost. She stated in her interviews that she was very close to her father, and that she was his favorite daughter because she was the baby in the family. The pain that Jennifer has suffered by the loss of her father is evident from the numerous statements related by Dr. Dangle such as her statement that she wanted to die so she could go to heaven and see her father. The prognosis for Jennifer is better than her other siblings, but there is no question that the loss of her father will result in feelings of insecurity and pain throughout the rest of her life. Jennifer has nevertheless done well in school since the time of the crash, and no conduct problems have been reported by her teachers.

28. Dr. Dangle stated that if he had to quantify the suffering that the children have experienced between that prior to the time of trial and that which they would suffer in the future, he would estimate that the suffering has been split 50–50. That is, he stated that the children have suffered approximately one-half of the anguish that they are likely to suffer already, and that they will suffer the same amount in the future.

29. Dr. Dangle summarized his examinations of the Douglass family to state that the crash of Delta Flight 191 dramatically affected the family. Dr. Dangle's own words best state the impact that the crash of Delta Flight 191 has had on the Douglass family:

The Delta plane crash of August 2, 1985, destroyed the Douglass family. Aside from providing financially for his family, Mr. Douglass played a significant role in the lives of his three young children and his wife. Each shared a unique relationship with him. For Christopher, he was a teacher, a golfing companion, an athlete, a confidant. For Byron, he was someone to roughhouse with, someone just like himself, someone to help Byron corral his boundless energy. For Jennifer, he was daddy, the one who worshipped her, who thought everything she did was perfect. For Mrs. Douglass, he was her rock of Gibraltar, her dream, her life.

The Douglass' [sic] now are divided, each going in their own way, each dealing with this tragedy alone. The children grapple with feelings and fears they don't understand. Mrs. Douglass anguishes over the loss and the overwhelming responsibility that she never wanted but that she must face, every day, alone. Mr. Douglass' death caused irreversible damage to the lives of three innocent children and the disintegration of a once happy family.

### D. *Mr. Douglass' Employment Experience*

■ 30. As noted above, Mr. Douglass was working for Metromedia/Network One at the time of his death. He was the Regional Vice–President of Sales for that company, and had been recently promoted to that job in Ft. Lauderdale, Florida. The annual salary base plus bonus for that position was $85,000.00 a year. With benefits, the compensation exceeded $90,000.00 annually. The Court received the testimony of Mr. Terry Houston, who was a colleague of Mr. Douglass' at Metromedia. The Court also received the depositions of Mr. Joe Webb and Ken Ford. Mr. Webb was Mr. Douglass' immediate superior at Metromedia, and Mr. Ford was another colleague at Metromedia.

31. It is clear from this testimony that Mr. Douglass had a bright future, both at Metromedia, and in the telecommunications industry. All three gentlemen felt certain that Mr. Douglass had the potential for promotion, and would certainly have been promoted in the industry. Shortly after his promotion to the vice-president position at Metromedia/Network One, Michael Douglass was appointed the Chairman of the Management Committee of Network One. Mr. Houston stated that this chairmanship position was significant, because it indicated that the executives of Metromedia had a good deal of confidence in Mr. Douglass, particularly given that he had not been with Metromedia for a very long time. Mr. Houston further stated that Metromedia was considering creating a general manager position over each of the three Metromedia long distance companies (one in New York, one in Texas, and Network One in Florida). It was Mr. Houston's opinion that Michael Douglass would have been the choice for one of these positions, most likely Network One. Such a promotion would have resulted in a considerably larger salary. It is clear from the testimony of these witnesses that there is a short supply of capable executives in the telecommunications industry. Mr. Douglass was such an executive, and thus had a good prospect for promotion throughout his career.

32. The Court also received the testimony of Dr. Jane Giacobbe concerning the potential career paths that Michael Douglass would likely have pursued had he not died in the crash of Delta Flight 191. Dr. Giacobbe is an Assistant Professor at The University of Texas at Arlington teaching in the labor relations, personnel management, and labor and employment law fields. She received her Bachelor's and Master's Degrees from Kansas State University in 1974 and 1982, respectively. She received her Ph.D. from Cornell University in 1986, focusing her study on industrial relations

and personnel and human relations management.

33. Dr. Giacobbe reviewed various surveys and background data on executive compensation, and career movements of executives. She also interviewed Joe Webb, Ken Ford, and Terry Houston, and reviewed the personnel files of Michael Douglass. Dr. Giacobbe testified that executives normally reach the peak of their career paths in their late forties or early fifties depending upon the size of the companies in which they are working. Further, she testified that they normally remain at that peak level until their retirement. From her review of Mr. Douglass' personnel records and interviews with his superiors and colleagues at Metromedia, Dr. Giacobbe was of the view that Mr. Douglass exhibited all of the characteristics that the literature states were crucial to the success of an executive. He had a good background in the telecommunications field, and he had a Master's in Business Administration, as well as a degree from the Thunderbird School of Management.

34. Dr. Giacobbe testified that it would be very unreasonable to assume that Mr. Douglass would have stayed in the job he held at the time of his death had he not died in the crash of Delta Flight 191. All of the statistical data, as well as the personal data, indicated that Mr. Douglass would have advanced in his career. Dr. Giacobbe prepared what she termed as a very conservative estimate of Mr. Douglass' potential advancement, which is summarized on Plaintiffs' Exhibit 86. That estimate indicated that it was likely that in mid-1986 Mr. Douglass would have been promoted to the General Manager position of Network One. The compensation for such a position is estimated to have been approximately $100,000.00, plus pension benefits. Had Mr. Douglass been promoted to the same position over the Texas region, the compensation would have been approximately $130,000.00, plus pension. Dr. Giacobbe was of the view that by the year 1992, Mr. Douglass would likely have advanced to the position of Chief Operating Officer of a major telecommunications company's regional office. She estimated the salary, including all benefits, of such a position to be approximately $250,000.00 per year.

35. Defendant pointed out that the career paths of Mr. Joe Webb and Mr. Terry Houston after they left the Metromedia firm resulted in lower annual salaries than they were receiving at Metromedia. Thus, Defendant suggested that Dr. Giacobbe's career path estimates were overstated. A review of the testimony indicates, however, that any decrease in salary is a result of these men entering into entrepreneurial ventures in the telecommunications industry. Both individuals expect to earn significantly more money in these entrepreneurial ventures than they had been earning at Metromedia, and there is no evidence to indicate to the contrary. Indeed, Mr. Webb stated that for the year 1987 he was receiving an annual salary of $60,000.00, but that in 1988 he expected to receive in addition to his $60,000.00 salary, $100,000.00 in dividends. Moreover, the Court finds that there was no reason to believe that Mr. Douglass would have quickly left Metromedia. Mr. Ford's advancement in Metromedia is representative of the type of advancement that Mr. Douglass could have conservatively expected. At the time of his deposition, Mr. Ford was earning between $90,000.00 and $120,000.00, and was the division vice-president and general manager over Metromedia's Texas branch. Further, Mr. Ford has prospects of further advancement in the company. These facts corroborate Dr. Giacobbe's conclusions.

E. *Lost Earnings*

36. Plaintiffs also presented Dr. Frederick Harris as an expert witness. Dr. Harris testified as to the lost earnings suffered by the Plaintiffs in this case as a result of Mr. Douglass' death. Dr. Harris is currently an economics professor at The University of Texas at Arlington. He received his Ph.D. in Economics from the University of Virginia in 1981. He has published extensively in the field of Economics, and has testified extensively in cases such as this. Dr. Harris essentially presented three ca-

reer paths that Michael Douglass could have possibly pursued, and determined the lost earnings of Mr. Douglass based upon the path that he pursued. The first career path was based upon Mr. Douglass maintaining the job he had at his death, with the salary at the time of his death up through age 63. Career path number two was based upon Mr. Douglass maintaining his job with Metromedia that he held at the time of his death up through 1986, and then assumed an advancement to the position of general manager until late 1987, and ended with Mr. Douglass holding the position of general manager of LDS, the Texas branch of Metromedia up until the time of his retirement at 63. Finally, career path number three contains these same assumptions, except that it assumes that in 1993, up until the time of his retirement at age 63, Mr. Douglass would have been the chief operating officer of a major telecommunications firm. Based upon these assumptions, Dr. Harris reached the following conclusions concerning the lost earnings of the Plaintiffs in this case:

a. Pre-trial loss of the Plaintiffs under career path one is $257,036.00; post-trial loss of the Plaintiffs under career path one is $1,684,585.00;

b. Pre-trial loss of the Plaintiffs under career path two is $308,671.00; post-trial loss of the Plaintiffs under career path two is $2,376,012.00;

c. Pre-trial loss of the Plaintiffs under career path three is $292,295.00; post-trial loss of the Plaintiffs under career path three is $4,086,253.00.

All of these figures are stated in present values.

37. Dr. Harris used certain assumptions to reach these conclusions. For example, in making the conclusions in Career Path One, he assumed a growth rate of salary of 8.54%. The Court finds this amount to be reasonable for the growth rate of executive salaries such as that being earned by Mr. Douglass at the time of his death, based upon the literature presented by Dr. Harris, as well as the testimony of Dr. Harris.

38. Dr. Harris used a discount rate of 9.02% for converting figures to present val-ue. Again, the Court finds this to be a reasonable figure. The Court also finds Dr. Harris' consumption figures to be reasonable, and supported by the literature presented to the Court. Dr. Harris' assumptions for career paths two and three were essentially the same as that for career path one, except that Dr. Harris used a growth rate of salaries of 9.08%. Again, the Court finds this growth rate to be reasonable based upon the literature presented by Dr. Harris. For all of the career paths, Dr. Harris assumed a work life expectancy of 22.96 additional years, resulting in retirement by Mr. Douglass at the age of 63. Dr. Harris used a life expectancy for his projections of approximately 74.5 years.

39. The Court finds that the Defendant's criticisms of Dr. Harris' assumptions are not valid. The Defendant's criticism that Dr. Harris used multiple growth rates by using both a growth rate for salary and assuming promotions, ignores the reality of the situation. Mr. Douglass would certainly have advanced in his field, and received increases in salary through promotion. At the same time, had Mr. Douglass maintained a position in the company, the salary for that position was likely to grow at the growth rate demonstrated by the research of Dr. Harris. Thus, Dr. Harris was not "double counting" in his methodology in this regard. Further, the Court finds Dr. Harris' consumption figures to be reasonable and does not find those consumption figures presented by the Defendant to be so. The Defendant's criticisms that the conclusions of Dr. Harris are tainted because he relied on the conclusions of Dr. Giacobbe, and the interviews with Mr. Douglass' superiors and colleagues at Metromedia, are without merit. The Court finds that it was reasonable to rely upon this information, and that the information relied upon was accurate.

F. *Loss of Inheritance*

40. On the issue of loss of inheritance, Plaintiffs called Dr. James R. Vinson. Dr. Vinson in an economist who obtained his Bachelor's in Business Administration from

Hardin–Simmons University in 1963, as well as Master's Degrees from Hardin–Simmons and the University of Houston. He obtained his Ph.D. in 1968 from the University of Houston. He has taught Economics, and has consulted with and testified before numerous agencies of both the state and federal governments. His experience is extensive, as demonstrated by his curriculum vitae, which was Plaintiffs' Exhibit 94. The Court found him to be well-qualified in his field.

41. Dr. Vinson based his report of the lost inheritance of the survivors of Michael Douglass mainly upon a survey produced by numerous government agencies. The agencies involved in the survey were the Board of Governors of the Federal Reserve System, the United States Department of Health and Human Services, the Federal Deposit Insurance Corporation, the Comptroller of Currency, the Federal Trade Commission, United States Department of Labor, and the United States Treasury, Office of Tax Analysis. The survey is entitled "1983 Survey of Consumer Finances." The survey was published in an article in the Federal Reserve Bulletin. The survey is essentially a study on the distribution of wealth in the United States, and of net worths of families with various characteristics. Dr. Vinson testified that by using the survey, he could reach a reasonably accurate prediction of the net worth that Mr. Douglass would have achieved upon his death, had he not died in the crash of Delta Flight 191. Dr. Vinson relied for his conclusions upon the reports of Drs. Harris and Giacobbe and the conclusions reached by those experts on the potential career path of Mr. Douglass, and the potential earnings of Mr. Douglass. He also based his report on an interview with Mrs. Douglass, in order to determine the investment characteristics and abilities of Michael Douglass. Such characteristics inquired into included Mr. Douglass' risk-taking attitudes, his attitudes toward liquidity, his tendencies concerning debt ratios, his tendencies toward diversified investment, his tendencies to trade in publicly-traded stocks, his tendencies to use professional advisors in trading in stocks, and his tendencies to use multiple financial institutions.

42. At the time of his death, Michael Douglass had a net worth of approximately $404,000.00. Based upon the factors set out in the government's survey, and adjusting out certain items of net worth held by Mr. Douglass at his death that do not fit within the confines of the survey, Mr. Douglass' net worth at his death placed him in the upper percentiles of individuals with his same age, occupation, and income. Dr. Vinson testified that it was clear that Mr. Douglass was above average in his investment abilities, and in his abilities to increase his net worth. Using the assumptions set out above, Dr. Vinson reached the following conclusions: Based upon the performance of Michael Douglass compared to others in his age group, the present value of his likely net worth at the time of his natural death would have been $2,881,950.00. Based upon his performance as compared to others within his same income category, and based upon conclusions concerning the income category in which Mr. Douglass would have likely found himself at the time of his natural retirement, the present value of the net worth at his death would likely have been $4,845,430.00. Finally, had Mr. Douglass done nothing more than simply allow the net worth that he had already obtained at the time of his death on Delta Flight 191 to grow, the present value of his net worth would have grown to a present value of approximately $1,130,207.00. This last figure was an extremely conservative estimate in the opinion of Dr. Vinson, and assumed that nothing more than had already been done by Mr. Douglass would have taken place. The average of these figures is approximately $2,952,529.00. Dr. Vinson stated that it was his opinion based upon all of the above information that the probable present value of the lost inheritance to the survivors of Michael Douglass was $2.9 million.

G. *Defendant's Expert*

43. In an effort to rebut the testimony of Drs. Giacobbe, Harris, and Vinson, Defendant offered the testimony of Mr. John Sartain. Mr. Sartain is a consulting econo-

mist, with a Master's Degree in Economics from Southern Methodist University. He obtained his undergraduate degree in History from Hampden–Sydney College in 1965. Mr. Sartain began his studies at SMU intending to obtain a Ph.D. degree, but withdrew from the program and received his Master's degree in Economics. In the past, he spent the majority of his time in economic consulting working in the regulatory area, working for savings and loans, conducting feasibility and economic policy studies, and testifying before the regulatory agencies. He now spends approximately 70% of his time doing litigation support in both business litigation and personal injury cases.

■ 44. Insofar as Mr. Sartain attempted to rebut the testimony of Dr. Giacobbe, the Court finds that Mr. Sartain does not have any expertise in the area of executive compensation, or personnel advancement. Thus, the Court rejects his testimony insofar as he attempted to rebut the testimony of Dr. Giacobbe concerning Mr. Douglass' potential career paths.

■ 45. Mr. Sartain also offered testimony concerning the lost earnings of the Plaintiffs in this case. Defendant's Exhibit 17A summarizes the conclusions of Mr. Sartain concerning the lost earnings of Mr. Douglass' survivors. In reaching these conclusions, Mr. Sartain made certain assumptions. First, he assumed that Mr. Douglass would not have received any promotions from the position that he held at the time of his death. As stated by the Court earlier, this assumption is grossly unrealistic, given the unrebutted testimony concerning Mr. Douglass' abilities, taken in conjunction with the fact that he was only 40 years old at the time of his death. Second, Mr. Sartain used figures titled "New Work Life Table" found in column H of Exhibit 17A. These figures are intended to state the probability of an employee being in the work force at given ages. Mr. Sar-

tain testified that this probability includes both voluntary and involuntary exits which would include premature deaths. According to Mr. Sartain, these figures came from a Bureau of Labor Statistics study. The figures are not tied to specific individuals in specific fields with specific characteristics. Rather, they are general statistics, intended to apply to the entire work force. Finally, Mr. Sartain used consumption patterns which resulted in the consumption of Mr. Douglass ranging from 18.65% of the family's income in 1985 and increasing to 35% for the year 2020. Mr. Sartain used a life expectancy for Mr. Douglass of 74.73 years. Based upon these assumptions, Mr. Sartain concluded that the Plaintiffs had suffered a pre-trial loss of earnings totaling $268,300.00 and a post-trial loss of $1,109,397.00. Mr. Sartain also computed the identical figures taking into account income tax considerations, and reached the conclusion that the pre-trial loss was $211,-570.00, and the post-trial loss $956,971.00. He admitted on cross-examination that taking into account income tax is probably not proper under Texas law.[1]

46. The Court finds Mr. Sartain's conclusions unpersuasive for several reasons. First, as stated above, his assumption that Mr. Douglass would not have received any promotions throughout his lifetime is wholly unrealistic and is contradicted by credible evidence in this case. Further, the growth rate used for the salary of Mr. Douglass was understated, and was not sufficiently tied to the type of work in which Mr. Douglass was employed. As Dr. Harris pointed out in his testimony, the studies available indicate that a growth rate in the type of job Mr. Douglass held is closer to 9%, as opposed to the 5.22% rate used by Mr. Sartain. Third, the consumption pattern used by Mr. Sartain is overstated. Again, Dr. Harris' consumption patterns appear to be closer to reality, and have more basis in the currently available labor and consumption data. Finally, the

---

1. Indeed, it appears to be uncontested that the Court is not to take into account income tax in calculating wrongful death damages under Texas law. *See e.g., Missouri–Kansas–Texas R.R. Co. v. McFerrin,* 156 Tex. 69, 291 S.W.2d 931, 945 (1956). Because this is a diversity case, the Court must apply Texas law on damages issues. *Smith v. Industrial Constructors, Inc.,* 783 F.2d 1249, 1250 (5th Cir.1986).

work life column of Mr. Sartain's report results in unreliable and understated conclusions. The study is based upon the total work population, and is not sufficiently tied to the individual characteristics of Mr. Douglass. Further, taking into account the probability that one who has already died a wrongful death would die yet another premature death appears to be double counting. Moreover, as pointed out by Dr. Chun Lam, a rebuttal witness brought by Plaintiffs, the computer study used by Mr. Sartain to obtain these new work life figures contained numerous flaws in its original form, thus casting doubt on the reliability of other aspects of Mr. Sartain's analysis. In summary, Mr. Sartain's conclusions as to lost earnings are rejected by the Court because of their unrealiability, and because they understate the damages suffered by the Plaintiffs in this case.

■ 47. Mr. Sartain also testified concerning his opinions of the loss of inheritance suffered by the Plaintiffs as a result of the crash of Delta Flight 191. Unsurprisingly, Mr. Sartain testified that the Plaintiffs had suffered no loss of inheritance as a result of Mr. Douglass' death. His conclusion was based upon a number of separate studies of the Douglass' investments and income tax returns. First, he summarized the investment income received by Michael Douglass as reported on the Douglass' tax returns from the years 1980–1985. He concluded from these returns that the Douglasses indicated a net loss in investment income for the years 1980–1985. Second, he looked at the rate of return on selected investments made between 1980 and 1985. These investments included four rental properties held by the Douglasses. From this review, he concluded that the rate of return on these investments during that time period was not sufficient to establish a positive net worth in the future. Mr. Sartain also compiled an analysis of the income gained from rental properties owned by the Douglasses. This analysis is contained in Defendant's

Exhibit 22C. Mr. Sartain concluded from this analysis that the income generated from these rentals was not indicative of a growth in net worth in the future. Finally, Mr. Sartain testified that it was his understanding that Mr. Douglass had inherited approximately $260,000.00 in 1979. Based upon this information, Mr. Sartain prepared a chart indicating the alleged historic growth rate of that inheritance from 1979 to the time of Mr. Douglass' death in 1985. Mr. Sartain used a figure of $326,050.00 for the total net estate of Mr. Douglass at the time of his death in 1985. Based upon these two figures then, Mr. Sartain reached a conclusion that the real growth rate of the inheritance from 1979 to 1985 was − 2.05%.

48. There are serious flaws in all of Mr. Sartain's analyses on the issue of lost inheritance. First, as pointed out by Dr. Vinson, the information concerning the summary of investment income that was obtained from a review of tax returns is very misleading, because it ignores other investments that are not reflected on such returns. Further, the chart contained in Exhibit 22C purporting to review investments in real estate is also misleading, because of several factors. First, the sale of that real estate is indicated to have occurred within a few short months after Mr. Douglass' death, and the prices received from such a distress sale are certainly not indicative of the investment ability of Mr. Douglass, or the prices the real estate could have brought if sold under better circumstances. Moreover, Mr. Sartain completely failed to take into account the tax advantages of such rental properties, which may well have been the motivation for the investments in the first place. Finally, Mr. Sartain's review of the historic growth rate of the 1979 inheritance is extremely misleading. Mr. Sartain did not explain why he used the figure $326,050.00 as the 1985 total net estate.[2] He agreed that the total estate was actually $404,-

2. As noted above, see Finding of Fact No. 42, Dr. Vinson used this figure in his lost inheritance study because, as he stated, certain items of net worth did not fit within the confines of the study upon which he based his opinions. Mr. Sartain, however, did not use this study, and his use of this figure is totally unwarranted.

000.00. There can be no rational basis for excluding $78,000.00 from this figure. More importantly, Mr. Sartain did not explain why he chose the arbitrary date of 1979 to review the growth of investments of Mr. Douglass. It would have been just as reasonable to have selected a date 20 years prior to 1985, when Mr. Douglass was likely just beginning to acquire assets, and review the growth of those assets up to the 1985 date. In other words, from a review of Mr. Sartain's Exhibit 22, one might conclude that the only assets Mr. Douglass held at his death were those acquired from the inheritance in 1979 enhanced through growth. That is certainly not the case, and is not reflective of the facts in the record.

49. The most compelling evidence of the lack of accuracy of Mr. Sartain's projections of lost inheritance is the status of Mr. Douglass' estate at the time of his death in 1985. As is clear from the evidence, Mr. Douglass did not start earning a substantial income until the five years prior to his death, and his income had not truly started to grow markedly until a matter of two years before his death. Nevertheless, even with this limited income, Mr. Douglass had amassed an estate in excess of $400,000.00 at the age of 40. It strains credulity to believe that a man who had been able to amass an estate of $400,000.00 at the age of 40, and who was poised to start earning annual incomes in six figures for 20 years to come, would at the age of 65 have had a zero or negative net worth. Nevertheless, that is what Mr. Sartain is asking the Court to believe.

50. In sum, the Court finds Mr. Sartain's opinions unpersuasive. In many instances they are not supported by the evidence, and in other instances the analysis is suspect. Indeed, the errors contained in Mr. Sartain's initial lost earnings analysis reflect poorly on the rest of his conclusions, and make the Court hesitant to rely on those conclusions. Because Mr. Sartain has undervalued the Plaintiffs' damages, the Court finds that his conclusions should be rejected.

## H. *Pre-impact Mental Anguish*

51. The evidence offered by the Plaintiff on this issue is contained in stipulations 2, 3, 41, 42, and 46, made a part of the Amended Pre–Trial Order in section 5 (facts and issues not in dispute), as well as Defendant's exhibit D–25. The stipulations indicate that Michael Douglass was a first-class passenger on Delta Flight 191, and that he died as a result of the crash of that airliner. The stipulations also show that the plane was a Lockheed L–1011, and that the first-class cabin on that plane consists of the first five rows of passenger seats. Exhibit D–25 is simply the Pilot's Reference Manual for an L–1011, and it does not add to these stipulations.

52. The Plaintiffs also offered the video depositions of six survivors of the crash, along with the Report of the Plaintiffs' Steering Committee's Sub–Committee on Pre–Impact Pain and Suffering, filed in the Multi–District Litigation case that resulted from the crash. The Court has reviewed this evidence as well. The Defendant objected to portions of these depositions, but the Court need not rule on these objections, as any ruling would have no bearing on the Court's conclusions on this issue. The Defendant offered a cockpit voice recorder transcript excerpt, indicating the conversation moments before the crash, as well as a "wind field display" video, along with the corresponding testimony from the computer expert who created the model. These exhibits were admitted solely as offers of proof, however, and have not been reviewed by the Court on this issue.[3]

53. The evidence from the survivors of Flight 191 is somewhat contradictory. Some of the survivors testified that they experienced fear and trepidation as the flight descended through the storm, while others stated that the approach was not unusual, and felt the same as any other approach made in stormy weather. Moreover, these passengers were all seated in

---

**3.** In orders entered prior to trial, the Court ruled that the Defendant could not present this testimony because of the late designation of the expert witness.

the rear of the plane, and were in a better position than Mr. Douglass to see that the plane had struck a car on FM 114, and had come down short of the runway.

## III. CONCLUSIONS OF LAW

This matter is governed by the law of the State of Texas, as this is a diversity case. *Smith v. Industrial Constructors, Inc.,* 783 F.2d 1249, 1250 (5th Cir.1986). Under Texas law, a wrongful death plaintiff is entitled to recover for the following items of damage:

1) Pecuniary loss of the surviving plaintiffs, (Including lost earnings);

2) Mental anguish and loss of society and companionship of the surviving plaintiffs; and

3) The loss of inheritance caused by the wrongful death (*see Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630 (1986)).

*See Moore v. Lillebo,* 722 S.W.2d 683, 687–88 (Tex.1987). Moreover, the estate of the deceased is entitled to recover for the loss of property caused by the crash, as well as any conscious pain and suffering or mental anguish suffered by the deceased immediately prior to the crash. *Yowell,* 703 S.W. 2d at 634.

Pecuniary loss is intended to compensate "direct economic losses." *Moore,* 722 S.W. 2d at 687. "Mental anguish represents the emotional response to the wrongful death itself," whereas loss of society "constitutes a loss of positive benefits which flowed to the family from the decedent's having been a part of it." *Id.* at 687–88. The two do not compensate for the same loss. *Id.* (describing the elements as "distinguishable" and "separate elements of recovery"). Loss of inheritance is defined as "the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death." *Id.* (*citing Yowell,* 703 S.W.2d at 633).

### A. *Pecuniary Losses*

As set out above, the evidence indicates that the loss of earnings suffered by the Plaintiffs as a result of Michael Douglass' death is significant. It is the Court's view, and the Court hereby finds, that Michael Douglass would have received promotions from the position he held at the time of his death. Assuming, as Defendant's expert did, that Mr. Douglass would have remained in the position he held in August, 1985 up until the time of natural retirement ignores all of the facts. The primary evidence pointed to by Defendant to contradict the testimony of Dr. Giacobbe, Terry Houston, Joe Webb and Ken Ford (all of whom testified on the issue of career advancement) was a single letter from Metromedia. That letter indicated that Metromedia did not have a set career path for Mr. Douglass, and that Metromedia was not willing to predict what position he would have achieved had he not died in the crash of Flight 191. Defendant contends that this is the only reliable testimony on the issue of Mr. Douglass' future, and that to rely on the testimony of the four above-mentioned individuals required the Court to engage in speculation. It appears that the Defendant would contend that unless it can be said with *certainty* that a decedent would have advanced in his or her career, the trier of fact is not entitled to consider the possibility that the decedent would have increased his or her salary before retirement. This is simply an incorrect statement of the law. The Courts clearly allow the trier of fact to consider such evidence. *See e.g., Bell Aerospace Corp. v. Anderson,* 478 S.W.2d 191, 201 (Tex.Civ.App.—El Paso 1972, writ ref'd n.r. e.); *Borak v. Bridge,* 524 S.W.2d 773, 777 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); *Dickens v. United States,* 545 F.2d 886, 893 (5th Cir.1977). Further, the limitation on the conclusions the trier of fact is entitled to draw from such testimony is built into the definition of pecuniary damages. The Court may only award damages that it finds the plaintiff, *in reasonable probability,* would have received from the decedent's earnings. *See Moore,* 722 S.W.2d at 687 (defining pecuniary losses).

Of necessity, predicting future advancement of an individual results in less than certain predictions. This does not mean that the Plaintiffs are not entitled to recover damages that they, in reasonable probability, will suffer as the result of the Defendant's acts.

Moreover, in Mr. Douglass' case, such a prediction is not so risky. The evidence is undisputed that he was an exemplary executive, and that he was on his way up the corporate ladder. He was 40 years old, and thus at the age at which one would expect (and the evidence indicates) he would begin a rapid advance toward his eventual peak. The Defendant's attempts to classify this inquiry as impermissible speculation ignore the overwhelming and undisputed evidence on this point.

The Court is nevertheless sensitive to the problem of predicting an individual's business future. The Court is confident that the damages set out below are well within the confines of being the amounts that the Plaintiffs, in reasonable probability, would have received from the deceased's earnings, had he lived.[4]

Pecuniary losses prior to trial:

| | |
|---|---|
| Pamela Douglass | $ 225,362.25 |
| Christopher Douglass | 25,040.25 |
| Byron Douglass | 25,040.25 |
| Jennifer Douglass | 25,040.25 |
| TOTAL Pre-trial Loss: | $ 300,483.00 |

Pecuniary losses, which in reasonable probability the Plaintiffs will suffer in the future:

| | |
|---|---|
| Pamela Douglass | $ 2,423,349.30 |
| Christopher Douglass | 269,261.06 |
| Byron Douglass | 269,261.07 |
| Jennifer Douglass | 269,261.07 |
| TOTAL Post-trial Loss: | $ 3,231,132.50 |
| TOTAL Pecuniary Loss: | $ 3,531,615.50 |

■ The Plaintiffs also seek to recover pecuniary damages for loss of household services. Because there is no evidence in the record to support such an award, the Court will not make any award of damages for the loss of household services.

**B.  Intangible Damages**

In determining what might be termed "intangible" damages, the Court has kept in mind the statements of the Fifth Circuit regarding such damages. Most recently, in *Wheat v. United States,* 860 F.2d 1256 (5th Cir.1988), the court stated that "the trial court has wide discretion in awarding damages," and damage awards are reviewed under the clearly erroneous standard. *Id.* at 1259. At the same time, "the sky is not the limit for damage awards." *Id.* The standard of review dictates that an award will only be reduced if it "shock[s] the judicial conscience," or is "'so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption, or other improper motive,' or as 'clearly exceed[ing] that amount that *any* reasonable man could feel the claimant is entitled to.'" *Id.* (*quoting Calderera v. Eastern Airlines,* 705 F.2d 778, 784 (5th Cir.1983)). The court noted that in reviewing awards, comparing them to other awards in similar cases can be helpful, but also noted that each case depends on its own facts. *Id.* There does not appear to be any reason why these same comparison principles are not also applicable in making the original award.

Both parties briefed this issue, and cited cases they felt were analogous to this case. The cases cited by the Defendant (all from the Fifth Circuit) reflected awards between $200,000.00 and $500,000.00 for intangible damages for spouses, and between approximately $50,000.00 and $300,000.00 for children. The Plaintiffs also cited several cases, from both the Fifth Circuit and Texas. These cases indicated awards for intangible damages of between $400,000.00 and $1,000,000.00 for spouses and children. The Court has reviewed these cases in setting the damages indicated below, although none of the cases is truly analagous to these facts. It is for this reason that the Court's awards in this case are based primarily upon the facts presented to this

---

**4.** As noted earlier, under Texas law the Court is not to take into account income tax in determining these damages. *See* fn. 1. The amounts set out are therefore exclusive of income tax.

Court, and the live testimony the Court carefully heard, reviewed and weighed.

### 1. *Mental anguish*

In *Moore*, the Texas Supreme Court defined mental anguish as "the emotional response to the wrongful death itself." *Moore*, 722 S.W.2d at 687. The Court went on to state that mental anguish is concerned with compensating the Plaintiffs "for the harrowing experience resulting from the death of a loved one." *Id.* at 688. For purposes of a jury charge, the court instructed that a jury should be told that mental anguish is defined as:

the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of a family member.

*Id.* The trier of fact is instructed under Texas law to consider the following factors:

1) the relationship between husband and wife, or a parent and child;

2) the living arrangements of the parties;

3) any absence of the deceased from the beneficiary for extended periods;

4) the harmony of family relations; and

5) common interests and activities.

*Id.* The Court in *Moore* went to great lengths to differentiate between mental anguish and loss of society and companionship, making it clear that mental anguish is intended to compensate for the emotional suffering as a result of the death, and loss of society and companionship is intended to compensate for the positive benefits that the plaintiff has lost as a result of the death. *Id.*

■ The evidence, as described above, is almost entirely uncontroverted on this issue. There is no doubt that the Plaintiffs have all suffered great mental anguish in dealing with the loss of their husband and father, respectively. As much as three years after the crash, Mrs. Douglass' life is still greatly affected by the loss of her husband. There is no doubt that she suffered extreme mental anguish by the unexpected loss of her husband.

Applying the five factors required under Texas law confirms this conclusion. The relationship between Mr. and Mrs. Douglass was a very close one, probably closer than most husbands and wives. As husband and wife, the Douglasses of course resided together. There was no evidence indicating that Mr. Douglass was absent for any extended periods. Indeed, the evidence indicated that Mr. Douglass, at the time of his death, had started working in Florida pursuant to his recent promotion, but was nevertheless commuting back to San Antonio on the weekends. Mr. Douglass died when one of the many flights he took to return to San Antonio crashed. The Douglass family relationships were very harmonious, and the entire family shared common interests and participated in activities together on a frequent basis.

Upon this evidence, the Court finds that Mrs. Douglass should be awarded the following amounts to compensate her for the mental anguish she has suffered, and in reasonable probability she will suffer, as a result of the wrongful death of Michael Douglass:

PAMELA DOUGLASS

| | |
|---|---|
| Mental anguish suffered in the past: | $ 300,000.00 |
| Mental anguish, which in reasonable probability will be suffered in the future: | 200,000.00 |
| TOTAL Mental Anguish: | $ 500,000.00 |

■ As set out in the findings of fact, there is also little question that the children of Michael Douglass suffered greatly as the result of his death. Once again, the Defendant did not offer any evidence to contradict this conclusion. Indeed, the only evidence that Defendant points to in mitigation of these damages is evidence that despite the loss of their father, the children are doing well in school, and are participating in extra-curricular activities. The Defendant apparently suggests that this evidence indicates that the children have not suffered severe emotional trauma as a result of the crash. To the contrary, such evidence simply shows that children have borne their grief and trauma with courage, and by no means does it tend to show that they have suffered "reduced" mental an-

guish. The Defendant also attacks the conclusions of Dr. Dangle, but has not offered any controverting evidence. The Defendant was free to have the children examined by their own psychologist, and offer his or her testimony, but it chose not to do so. The Defendant is therefore in a poor position to urge the Court to reject the uncontroverted conclusions of Dr. Dangle.

█ As with Mrs. Douglass, the factors articulated in *Moore* support the conclusion that the children are entitled to recover for their mental anguish. Like their mother, and perhaps as a result of their mother's suffering, the children have yet to deal completely with the loss of their father. The children were very close to their father, and participated in many activities with him. The youngest child expressed her desire to die so that she could see her father, and the middle child still carries on "conversations" with him. The oldest child has become withdrawn and is showing the signs of stress that come from one being forced to accept responsibilities more appropriate for one twice his age. These are not the signs of a happy family, untouched by the loss of their father. Accordingly, the Court finds that the children should be awarded the following amounts to compensate them for the mental anguish they have suffered, and in reasonable probability will suffer, as a result of the wrongful death of Michael Douglass:

CHRISTOPHER DOUGLASS

| | |
|---|---|
| Mental anguish suffered in the past: | $ 50,000.00 |
| Mental anguish, which in reasonable probability will be suffered in the future: | 50,000.00 |
| TOTAL Mental Anguish: | $100,000.00 |

BYRON DOUGLASS

| | |
|---|---|
| Mental anguish suffered in the past: | $ 37,500.00 |
| Mental anguish, which in reasonable probability will be suffered in the future: | 37,500.00 |
| TOTAL Mental Anguish: | $ 75,000.00 |

JENNIFER DOUGLASS

| | |
|---|---|
| Mental anguish suffered in the past: | $ 25,000.00 |
| Mental anguish, which in reasonable probability will be suffered in the future: | 25,000.00 |
| TOTAL Mental Anguish: | $ 50,000.00 |

2. *Loss of companionship and society*

█ Recovery for loss of companionship and society is distinct from recovery for mental anguish. Whereas mental anguish is intended to compensate for "the harrowing experience resulting from the death of a loved one," *Moore*, 722 S.W.2d at 688, loss of companionship and society damages are to compensate for the "loss of positive benefits which flowed to the family from the decedent's having been a part of it." *Id.* at 687–88. The two are distinguishable, and are separate elements of recovery. *Id.*

The evidence on this point was also uncontroverted. Mr. Douglass was an important part of the "team" that raised the Douglass children. The following are simply examples of the benefits he bestowed on the family: He was the parent who could control Byron, and without Mr. Douglass, Mrs. Douglass has a much more difficult time keeping Byron in check. Mr. Douglass spent a good deal of leisure time with his family, and he was instrumental in getting Christopher and Byron interested in athletics. He will no longer be there for those children, and that benefit was significant. The benefits he provided to his wife in raising the children, and in being her confidant are difficult to measure, but there is no question that they were significant. Considering the undisputed testimony on this issue, the Court finds that the Plaintiffs should recover the following damages for the loss of companionship they have suffered, and in reasonable probability they will suffer in the future as a result of the wrongful death of Michael Douglass:

PAMELA DOUGLASS

| | |
|---|---|
| Loss of companionship and society in the past: | $ 300,000.00 |
| Loss of companionship and society, which in reasonable probability she will suffer in the future: | 200,000.00 |
| TOTAL lost companionship and society | $ 500,000.00 |

CHRISTOPHER DOUGLASS

| | |
|---|---|
| Loss of companionship and society in the past: | $ 100,000.00 |
| Loss of companionship and society, which in reasonable probability he will suffer in the future: | 170,000.00 |
| TOTAL lost companionship and society | $ 270,000.00 |

BYRON DOUGLASS

| | |
|---|---|
| Loss of companionship and society in the past: | $100,000.00 |
| Loss of companionship and society, which in reasonable probability he will suffer in the future: | 225,000.00 |
| TOTAL lost companionship and society | $325,000.00 |

JENNIFER DOUGLASS

| | |
|---|---|
| Loss of companionship and society in the past: | $100,000.00 |
| Loss of companionship and society, which in reasonable probability she will suffer in the future: | 320,000.00 |
| TOTAL lost companionship and society | $420,000.00 |

### C. *Loss of Inheritance*

As noted earlier, Texas law provides that a wrongful death plaintiff is entitled to recover for loss of inheritance. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630 (Tex. 1986). The Court has defined loss of inheritance as:

> The present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death.

*Moore*, 722 S.W.2d at 687–88; *Yowell*, 703 S.W.2d at 633. In *Yowell*, the Texas Supreme Court noted that some courts have refused recovery for lost inheritance on the ground that calculating these damages leads to undue speculation. In rejecting this argument, the Court stated:

> Though probably nothing is more certain than the uncertainty of human life, presuming that thrifty persons will accumulate an estate and leave it to their heirs at death is no more speculative

than finding any of the other recognized elements of pecuniary loss in a wrongful death action, such as lost support, guidance and training.

*Yowell*, 703 S.W.2d at 633.

The Defendant suggests that the Fifth Circuit has "defined Texas loss of inheritance damages further in the case of *Moorehead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278 (5th Cir.1987)." Defendant's Post–Trial Brief at 7. The language from the *Moorehead* case relied upon by the Defendant for this statement follows a quote from the language in *Yowell*, set out above. Based upon the *Yowell* language, the *Moorehead* court concluded:

> Thus, under Texas law, damages for loss of inheritance are distinct from damages for pecuniary loss. Further, loss of inheritance damages are appropriate only where the wrongful death plaintiff shows that the decedent (1) would have enhanced his estate by some amount by saving some of his earnings or by prosperous management of his investments, and (2) would, in all reasonable probability, have left that amount upon his natural death to the plaintiff. Finally, the trier of fact has broad discretion to decide whether loss of inheritance damages are appropriate.

*Moorehead*, 828 F.2d at 290. Defendant's contention that this statement was intended to further define Texas law is clearly wrong. The language merely restates Texas law. Indeed, a federal court sitting in diversity does not have the power to define State law, but only to follow it, particularly where it is clearly stated, as here.

Defendant constantly criticized the analysis of Dr. Vinson on the loss of inheritance issue, largely because Defendant contends that it was not based upon an estimate of the Douglass' savings rate. As just stated, the plaintiff must show that the decedent would have enhanced his estate *either* "by saving some of his earnings *or* by prosperous management of his investments." *Id.* (emphasis added). Thus, a methodology that predicts the amount that the decedent, in reasonable probabili-

ty, would have added to his estate through investments is proper and acceptable.

The Court is aware that calculating loss of inheritance damages can require a good deal of speculation, but *"Yowell* gives the trier of fact the right to engage in—or refuse—such speculation." *Moorehead,* 828 F.2d at 291. Regardless, any award must be based upon reasonable probability. *Yowell,* 703 S.W.2d at 633. Considering these principles, the Court concludes that the Plaintiffs are entitled to recover for loss of inheritance in this case. There is no question concerning the second element of recovery—that Mr. Douglass would have left his estate to his wife and children. The Defendant did not attempt to contest this point, and the record showed that the will in effect when Mr. Douglass died left his estate to his wife. There is no reason to think, and the Defendant does not suggest any, that Mr. Douglass would have disinherited his wife prior to his natural death. Nor is there any reason to believe that he would not have included his children in his will once they reached majority. The Court therefore finds that in reasonable probability Mr. Douglass would have left his estate upon his natural death to the Plaintiffs.

As to the showing that Mr. Douglass would have enhanced his estate either through saving some of his earnings or by prosperous management of his investments, the Plaintiffs have carried their burden. As described in findings of fact 40 through 42 and 47 through 50, the Court finds the conclusions of Dr. Vinson more persuasive than those of Mr. Sartain on this issue. There appears to be no inherent reason why Dr. Vinson's predictions based upon the Consumer Finances survey are not reasonable estimates of the estate Mr. Douglass would have amassed at his natural death but for the wrongful death. As noted in findings 47 through 50, there are many reasons why the Court rejects the conclusions of Mr. Sartain. The most important of these, and the most compelling reason why the Court is going to award loss of inheritance damages in this case, is the fact that at the time of his early death, Mr. Douglass had already proven himself a

prudent and successful saver and investor. He had accumulated a positive net worth in excess of $400,000.00. There is nothing in the record to indicate that he would have squandered this estate. Rather, all of the evidence indicates that he would have increased it. Thus, the Court makes the following award for damages for loss of inheritance:

| The present value that Mr. Douglass would in reasonable probability have added to his estate and left at natural death to the Plaintiffs: | |
| --- | --- |
| Pamela Douglass | $ 847,655.25 |
| Christopher Douglass | 94,183.91 |
| Byron Douglass | 94,183.92 |
| Jennifer Douglass | 94,183.92 |
| TOTAL Lost Inheritance: | $1,130,207.00 |

**D.** *Damages Recoverable by the Estate of Michael Douglass*

As stated earlier, the estate of the deceased is entitled to recover for the loss of property as a result of the death, as well as the conscious pain and suffering or mental anguish experienced by the deceased prior to this death.

**1.** *Property loss*

█ The parties stipulated that the estate of Michael Douglass sustained actual property damages in the amount of $500.00, representing the value of Mr. Douglass' clothing and personal property lost in the crash. The Court will therefore award the estate $500.00 pursuant to the stipulation.

**2.** *Pre–Impact Mental Anguish*

█ It appears that Texas law permits the recovery of damages for any mental anguish suffered *prior* to impact in an air crash. *See Yowell,* 703 S.W.2d at 634. The Fifth Circuit has stated that in making a determination on pre-impact pain and suffering, the touchstone is whether there is evidence that is more than "speculative or purely conjectural" to support the Court's conclusion. *Haley v. Pan American World Airways,* 746 F.2d 311, 316 (5th Cir.1984). There must be some evidence to support the finding that the decedent suffered pre-death mental anguish. *Id.* Eyewitness testimony is not necessary to support such an award, however, because no

one will ever know what was going through the mind of the decedent before the crash. *Id.* at 317. In the *Haley* case, the court upheld a jury award of $15,000.00 for mental anguish based solely upon a computer simulated model of the final moments before the crash, along with the testimony of a psychiatrist on the issue of fear.

Based upon the evidence discussed in findings of fact 51–53, the Plaintiffs argue that the Court should infer from the fear experienced by the survivors of Flight 191 that Mr. Douglass likely experienced similar feelings of fear and imminent danger before he was killed when the plane broke up. The Defendant, on the other hand, argues that any such conclusion would be pure speculation. At least one other court has reviewed the same evidence presented to this Court. In that case, the court concluded that "the juxtaposition of [the contradictory depositions] coupled with a lack of testimony relating directly to [the decedent], precludes an award for any pre-impact suffering of the decedent." *Larsen v. Delta Air Lines, Inc.,* 692 F.Supp. 714, 721 (S.D.Tex.1988). This Court must reach the same conclusion on the state of the record. There is simply not enough evidence that the passengers seated in the front of the aircraft experienced the same fears as those in the rear, or that Mr. Douglass' feelings were more like the frightened survivors than the unfazed survivors. Accordingly, the Court will award no damages for pre-impact mental anguish.

### E. *Prejudgment Interest*

Although the parties started the trial disputing the proper method of determining, and even the availability of, prejudgment interest, they now agree that the interest issue is governed by the Texas Supreme Court's decision in *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). The Court need therefore not address this issue.

### IV. CONCLUSION

The Douglass family suffered a great loss when Delta Flight 191 crashed at DFW Airport. The Court has awarded the Douglasses the damages they are entitled to as a result of the crash. Unfortunately, these damages will not make them whole, as no amount of money will ever replace Michael Douglass. Nevertheless, it is hoped that having this trial completed will help this family, torn by sudden disaster, to move beyond these events and forward with their lives. A sad truth it is that an exemplary husband and loving father vanished forever in a terrible moment as Delta Flight 191 sought land, but it is a truth that must be accepted and resolved. That Michael Douglass' life was unusually productive; that he cultivated his intelligence and abilities; that he thrived as a courageous citizen who worked for his country and its values; that he lived his abbreviated life as a loyal father, husband, companion and friend; that he treasured his family as he did life itself are all the attributes of an extraordinary young man. They are attributes that should remain permanent, positive memories, bequests of character, footprints left on a tragically shortened path, but the path leads on for Pamela Douglass, Christopher Douglass, Byron Douglass, and Jennifer Douglass.

Accordingly, the Court finds that the Plaintiffs are entitled to a judgment for the amounts stated in this opinion. The Court hereby ORDERS that the parties confer and attempt to reach an agreement concerning the form of a judgment. That judgment shall be submitted no later than 10 days from the date of this opinion. If the parties cannot reach an agreement, the parties shall submit their separate proposals no later than 10 days from the date of this opinion.

The Court will appoint attorneys *ad litem* to represent the minor Plaintiffs, and to advise the Court on the appropriate structuring and investment of these Plaintiffs' awards.

Finally, any Finding of Fact which is more appropriately considered to be a Conclusion of Law, or any Conclusion of Law found to be a Finding of Fact, is hereby deemed to be such.